**Darrick Leonard GERLAUGH, Petitioner–Appellant,**

v.

**Terry STEWART, Director of Arizona Department of Corrections, Respondent–Appellee.**

No. 95–99018.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 23, 1997.

Decided Nov. 4, 1997.

---

Martin Lieberman, Tonya McMath, Phoenix, Arizona, for petitioner-appellant.

Paul McMurdie, Deputy Attorney General, Crane McClennen, Assistant Attorney General, Phoenix, Arizona, for respondent-appellee.

Before: REINHARDT, THOMPSON and TROTT, Circuit Judges.

Opinion by Judge TROTT; Partial Concurrence and Partial Dissent by Judge REINHARDT.

TROTT, Circuit Judge:

Scott Schwartz was a young man who walked with the aid of a leg brace and crutches. Shortly before midnight on January 24, 1980, he picked up hitchhikers Darrick Gerlaugh, Joseph Encinas, and James Matthew Leisure. What Mr. Schwartz did not know when he accommodated the group's request for a ride was that they had previously agreed to rob whomever picked them up.

As they rode together in Mr. Schwartz's car, petitioner Gerlaugh, who was already on probation for robbery, suddenly pointed a firearm at his host and forced him to drive to a deserted area near Mesa, Arizona. We borrow from the third opinion of the Arizona Supreme Court to relate what petitioner and his confederates then did to rob Mr. Schwartz not only of $37.00, but also of his life:

> There, the three men forced the victim out of his car. Petitioner pointed the gun at Schwartz and demanded money. Schwartz grabbed the gun from petitioner. While attempting to escape, the victim pointed the gun at Leisure and pulled the trigger. The gun did not fire. "You fucked up" petitioner exclaimed, "There's no bullets in the gun." The three men knocked Schwartz to the ground, where they beat and kicked him for ten to fifteen minutes. Petitioner then announced that they would have to kill Schwartz to prevent him from identifying them. Petitioner ordered Encinas and Leisure to hold Schwartz on the road so he could run the victim over with the car. The victim succeeded in dodging the car several times by diving into an adjoining canal. Petitioner finally ran over Schwartz with the victim's Lincoln Continental and felt the impact of the victim's body with the car. Petitioner ran over the victim two more times and struck the victim's head with the car bumper at least one time. At one point, petitioner positioned the car's left rear wheel on top of Schwartz and floored the accelerator. Although badly hurt, the victim was still alive

and was writhing in pain on the roadside. He began to plead with his assailants to tell him the reason for their attack. Petitioner took a screwdriver from the rear of the car and stabbed the victim in the head, neck and shoulders at least twenty times. Leisure also stabbed the victim ten to twenty times.

> A pathologist testified that these various assaults caused several injuries, any of which would have been fatal. The victim suffered numerous fractures, puncture wounds and internal injuries from his head to his midsection. His entire body was covered with bruises and abrasions. The three men dragged Schwartz's body off the road to an adjoining field and covered it with alfalfa. Petitioner kept all of the money taken from the victim.

> The three men returned to the road and drove away in Schwartz's car. When the car broke down, they resumed hitchhiking. They were picked up by Harry Roche in his pickup truck at about 2:00 a.m. Petitioner leveled the gun at Roche and forced him to make an apparently random series of turns. Finally, petitioner ordered Roche to pull off to the side of the road. Roche at first refused and complained that the roadside was too muddy at that particular point to stop. When petitioner pointed the gun at his head, however, Roche stopped the truck. Roche quickly put the truck in gear and sped away. Petitioner later admitted that he intended to rob Roche.

*State v. Gerlaugh*, 144 Ariz. 449, 454, 698 P.2d 694, 699 (1985).

The police interrogated petitioner Gerlaugh after his arrest, and he confessed to his participation in these crimes. When asked how he felt after he killed Mr. Schwartz, his chilling answer was, "How do you feel when you kill game?" *Id.* He added that he did not feel bad at all about killing the victim.

In a joint trial with Encinas, a jury convicted Gerlaugh of armed robbery, kidnapping, and first degree murder.[1] In addition to receiving sentences of twenty-one years on

---

1. Because the trial court suppressed co-defendant Leisure's confession, the State offered to

him a plea agreement which he accepted.

the armed robbery and kidnapping offenses to run consecutively with a sentence of thirty-five years to life for violation of his robbery probation, Gerlaugh was sentenced by the trial judge to death for the murder.

Petitioner Gerlaugh's case comes to us on appeal from a denial in the district court of his petition for habeas corpus. His presentation to the district court contained fifty claims, but here he advances only ten. We have examined these claims and the voluminous record in this case, and we find them to be without merit.[2] Accordingly, we affirm the district court.

## I

### Guilt-Phase Claims

Gerlaugh advances three claims related to the guilt phase of his trial. The district court examined each in detail and concluded that they lack merit. We agree. Accordingly, we limit our discussion of them to a brief explanation of why they fail in the context of federal collateral review.

### A.

■ Gerlaugh claims that the state trial court committed "fundamental error by refusing to instruct on lesser included offenses reasonably supported by the evidence," namely (1) second degree murder, and (2) theft. His theory of defense, which was presented to the jury and covered adequately by an instruction, was that his use of intoxicants negated the specific intents required for the crimes with which he was charged. As legal support for his argument, he refers us to *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *Vickers v. Ricketts*, 798 F.2d 369 (9th Cir.1986), which hold generally that in a capital case, a court must instruct on every lesser included offense for which there is in the evidence a substantial factual basis. *See also Hopper v. Evans*, 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982) ("[D]ue process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction."); *Spaziano v. Florida*, 468 U.S. 447, 456–57, 104 S.Ct. 3154, 3160–61, 82 L.Ed.2d 340 (1984) (holding that court need not give lesser included offense instruction where statute of limitations had run on those offenses).

■ We note first that "[u]nder Arizona law ... there is no lesser included homicide offense of the crime of felony murder since the mens rea necessary to supply the premeditation element of first degree murder is supplied by the specific intent required for the felony." *State v. Arias*, 131 Ariz. 441, 443–44, 641 P.2d 1285, 1287–88 (1982). But more fundamentally, even if we were to assume that such instructions as requested by the defendant should have been given to the jury, we can discern no "substantial or injurious effect or influence" from the failure to do so. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993). Notwithstanding his use of intoxicants, the evidence of Gerlaugh's actual intoxication was extremely weak, and the evidence of his intent to kill, to rob, and to kidnap was overwhelming-especially that coming from his own detailed confession. In it, Gerlaugh acknowledged to Detective Weiss that (1) his intent in hitchhiking was to commit robbery; (2) he consciously made a decision "to kill Mr. Schwartz so as not to be identified by him for the robbery;" (3) his intent in causing the left rear wheel to spin on Mr. Schwartz's body was to kill him; and (4) when the tire strategy failed, "[h]e exited the car to go over and finish killing Mr. Schwartz." Gerlaugh also acknowledged ending up with Mr. Schwartz's money and refusing to share it with his partners. Thus, the critical elements of the offenses with which Gerlaugh was charged were proved by overwhelming evidence. Accordingly, this claim must fail.

### B.

■ Gerlaugh's next claim, citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Cruz v. New*

---

2. Because Gerlaugh's petition was pending in federal court prior to the enactment on April 24, 1996 of the Antiterrorism and Effective Death Penalty Act of 1996, we use the "old law" to decide this case. *See Lindh v. Murphy*, —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

*York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), is that his Sixth Amendment right to confrontation of witnesses was violated by the admission into evidence of the confession of his nontestifying codefendant, Encinas. We note first that Encinas's and Gerlaugh's confessions were nearly identical. At the time Gerlaugh's conviction and sentence became final, *Parker v. Randolph,* 442 U.S. 62, 75, 99 S.Ct. 2132, 2140–41, 60 L.Ed.2d 713 (1979), did not bar the statements of codefendants from evidence so long as they were "interlocking." *Cruz* altered this rule in 1987. Second, Gerlaugh has never challenged the accuracy of his confession; in fact, he admitted to the probation officer writing a pre-sentencing report for the trial judge that it was correct. Accordingly, and assuming that Encinas was unavailable to testify, under *Cruz* and *Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986), his confession was properly introduced as admissible hearsay. But even if we assume that its admission was error, we conclude that the error was harmless by any standard because the codefendant's confession was thoroughly reliable and consistent with Gerlaugh's own description of the homicide. Indeed, portions of it were even helpful to him.

### C.

█ Gerlaugh's third claim has to do with the admission into evidence of (1) the admittedly gruesome photos of the decedent, and (2) the testimony of Mr. Roche, who evidently had been hypnotized prior to trial. On examination of these issues, we conclude as did the district court that they are not cognizable in this proceeding. Neither allegation raises the spectre of fundamental unfairness such as to violate federal due process of law. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 479–80, 116 L.Ed.2d 385 (1991) (federal habeas relief does not lie for state-law errors but is limited to violations of federal constitutional rights). Mr. Roche was unable notwithstanding the hypnosis to identify Gerlaugh at trial, and the remainder of his testimony, which was not about the

murder of Schwartz, was virtually unchallenged.

## II

### Penalty-Phase Claims

#### A.

Gerlaugh's most vigorous claim, one that divides this panel and requires our heightened attention, is that the representation he received from his appointed counsel in connection with the sentencing aspect of his case was not only ineffective, citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but so defective that it was as though he had no counsel at all. For the latter proposition, Gerlaugh directs our attention to *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). *Cronic* holds that if counsel fails to subject the state's case to "meaningful adversarial testing," then prejudice to the client will be presumed. *Id.* at 659, 104 S.Ct. at 2047. These Sixth Amendment claims Gerlaugh brings against his lawyer rest not only on what he says his counsel should have done but did not, but also on what counsel did do but allegedly did very badly. We note in passing that counsel for Gerlaugh was certified in Arizona as a specialist in the practice of criminal law. Gerlaugh's was his eighth death penalty case.

#### 1.

### The Failure to Call Witnesses

█ The first aspect of Gerlaugh's ineffective assistance claim is that his counsel knew of but failed to call as witnesses during the sentencing hearing three people who could have related relevant mitigating sentencing evidence to the court: Bertha Parkhurst, Helen Sanders, and Ramona Button. This same claim was first examined in detail in a post-conviction proceeding in State court. The post-conviction proceeding included an evidentiary hearing and was conducted by the same trial judge who had sentenced Gerlaugh to death.[3] At the hearing, the three character witnesses in question testified as to

---

**3.** Originally, the evidence was developed in front of another judge, but the matter was than transferred to Judge Brown who considered the transcript of the previous hearings.

what they could have said had they been called at the original presentencing hearing. In the main, the picture they presented of the petitioner was of a boy who had taken care of their children and pets without incident and who had displayed to them at least no violent or unpleasant tendencies. One of the witnesses buttressed her testimony with a vignette about Gerlaugh avoiding and showing concern for a snail on which he might have stepped, which suggests in context only that he had more respect for mollusca than people. The witnesses had no explanation for petitioner's recent brutal conduct which was the subject of his trial. Gerlaugh's father was also called to testify that, although he believed he was a good father, he was a very strict disciplinarian.

The judge at the conclusion of the postconviction hearing found that this evidence was insufficient to establish good character as a mitigating circumstance. Moreover, Gerlaugh's trial counsel was aware during the original trial of these cumulative witnesses and what they had to offer, but he made a tactical decision not to bring them into the case because of the questionable probative value of their testimony. He believed the testimony could backfire because it could indicate that although Gerlaugh was capable of compassion, he reserved it for animals, not human beings. Instead, trial counsel painted at sentencing a more direct and sympathetic picture of his client by calling his parents to the stand, and by interviewing six of petitioner's friends from school and then causing brief summaries of the information gleaned from them to be incorporated into petitioner's presentence report as mitigating evidence. In fact, the parents' testimony drew upon and incorporated in large measure what the three witnesses would have said about their son.

■ Under the circumstances, we believe that counsel's performance during this critical aspect of the sentencing phase was not deficient. He did what he could with what he had to work with, which was not much. Furthermore, this particular allegation does not involve potentially favorable evidence about which counsel was oblivious. Counsel knew about the evidence and looked into it,

but chose as a tactical matter not to use it. A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland.* 466 U.S. at 689–91, 104 S.Ct. at 2065–67.

In any event, even if we were to assume to the contrary, we agree with the Arizona Supreme Court and the district court that no prejudice can be shown based on counsel's choice not to call these witnesses and to proceed as he did. *See Bonin v. Calderon,* 59 F.3d 815, 823 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996) ("[w]here the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigating evidence.").

2.

The Failure to Use Psychological Evidence

■ The second aspect of petitioner's ineffective assistance claim is that counsel failed as part of the sentencing process to develop and to use psychological evidence on his client's behalf. In support of this allegation, petitioner presented the testimony of Dr. Thomas O'Brien, a psychiatrist, at the postconviction evidentiary hearing. On Gerlaugh's behalf, Dr. O'Brien testified that petitioner suffered from a character or personality disorder called sociopathy to the extent that petitioner's capacity to conform to the requirements of the law was grossly impaired. On the other hand, as the Arizona Supreme Court remarked,

> The unsavory portrait of petitioner that emerges from Dr. O'Brien's testimony is that of a remorseless, bullying sociopath who victimizes others merely for the macho thrill of proving his "superiority" to his victims and his contempt for society's laws. According to Dr. O'Brien, petitioner killed for the status he received by being able to escape the consequences of his actions. Thus, petitioner bragged about stealing money from his own family because he was able to get away with the theft.

144 Ariz. at 459, 698 P.2d at 704.

For four reasons, we discount the effect of counsel's failure to develop "Dr. O'Brien's

testimony" (or its equivalent) prior to petitioner's sentencing.

First, as held by the Arizona Supreme Court, the evidence of petitioner's "mere character or personality disorder like sociopathy is not alone sufficient to constitute a mitigating circumstance." *Id.* (citing *State v. Richmond,* 114 Ariz. 186, 197–98, 560 P.2d 41, 52–53 (1976)).

Second, although such psychiatric evidence is normally relevant and admissible because it may suggest some reason other than the disorder itself why the defendant should be treated with leniency, the trial judge hearing this evidence at the post-conviction hearing held that it did not establish a mitigating circumstance. The Arizona Supreme Court on review agreed with this conclusion. Parenthetically, the trial judge remarked during the post-conviction hearing that the picture painted by Dr. O'Brien of Gerlaugh conflicted dramatically with the evidence presented by Gerlaugh's three character witnesses referred to earlier in this opinion:

THE COURT: (To counsel for Gerlaugh) You really think it is ineffective assistance of counsel not to put on the psychiatric testimony and then to put on the lay witnesses who directly contradict everything the psychiatric testimony stood for? You find that to be ineffective when you have to make that choice? *See, because this Court is absolutely convinced that those lay witnesses absolutely have contradicted everything Dr. O'Brien testified to.* They said he was a perfectly law-abiding citizen. He was nonviolent. He was not sociopathic. He was kind to animals. He followed the rules. He did everything he was-he followed through. He didn't need instant gratification. He took care of the dogs. He did all the things that Dr. O'Brien said his personality precluded him from doing.

Now, what do I do with that? Mr. Foreman, why don't you help me?

MR. FOREMAN: Respectfully, I would disagree completely that their testimony is in any way inconsistent with Dr. O'Brien's testimony. As you heard from Dr. O'Brien-

THE COURT: He's either a nice, loving, dedicated, conscientious young man who

follows through, or he's a sociopathic personality. The two are absolutely inconsistent. And at the same period in his life, Mr. Foreman. That's why I raise the question, so you could help me understand where I'm missing something.

MR. FOREMAN: The problem here is one primarily of time. If you will look at the testimony you will find that the opinions that were expressed by Miss Parkhurst and by the other witness that we presented at the earlier hearing-

THE COURT: Miss Sanders.

MR. FOREMAN: Yes, Inez Sanders. Were based upon an extended period of time; years of involvement with the defendant.

Dr. O'Brien's testimony is based upon an evaluation conducted within the last year. And-

THE COURT: But his opinion relates back to the date of the offense.

MR. FOREMAN: Relates back to the offense. And he spoke about how Darick developed. Darick developed-

THE COURT: Did I misunderstand Miss Parkhurst saying that six months prior to this arrest, he was still handling the dogs? Or did I not hear the tape correctly?

MR. FOREMAN: You heard the tape correctly.

THE COURT: Okay.

(Emphasis added).

Third, petitioner specifically had informed counsel before trial and with the full knowledge that his life was in the balance that he "did not want to undergo a psychological examination because he did not want someone prying into his mind. Petitioner never indicated to defense counsel any time thereafter that he changed his mind about this decision." 144 Ariz. at 459, 698 P.2d at 704. Here is what counsel had to say about this issue during the State post-conviction hearing:

Q. But prior to trial did you discuss with them (sic) the probability of his seeing a psychiatrist?

A. Yes.

Q. And, are you saying that he refused to see a psychiatrist?

A. Yes. He did not want psychiatric involvement in the case.

We note that Gerlaugh has never challenged this testimony. Petitioner's personal wishes in this regard are entitled to respect. *See Jeffries v. Blodgett,* 5 F.3d 1180, 1197–98 (9th Cir.1993) (counsel not ineffective for acquiescing in defendant's wishes regarding the nature of his defense); *Bonin v. Calderon,* 59 F.3d at 834 ("[T]he presentation of expert [psychiatric] testimony is not necessarily an essential ingredient of a reasonably competent defense."). In addition, the trial judge in the post-conviction proceeding entered a finding of fact that "Petitioner had failed to establish that he was willing to have psychiatric testimony presented at the sentencing hearing." About this issue, the Arizona Supreme Court said:

> The Supreme Court has indicated that an attorney's decisions concerning representation can properly be influenced by his client's wishes. *See Strickland v. Washington, supra,* 466 U.S. at 690–93, 104 S.Ct. at 2066–67, 80 L.Ed.2d at 695–96. A defense attorney's deference to his client is especially appropriate where the defendant has a privacy interest at stake. *Cf.* 17 A.R.S. Rules of Criminal Procedure, rule 15.2(a)(8) (defendant cannot be forced to submit to a psychiatric or psychological examination). Defense counsel is obligated to insure that his client is aware of the consequences of such a decision. Petitioner has not, however, shown that trial counsel failed to render adequate advice regarding this decision.
>
> Additionally, the record reveals that trial counsel suggested to the trial court at sentencing that a psychiatric examination of petitioner would be helpful in deciding punishment. Trial counsel conceded, however, that failure to order such an examination would likely not constitute reversible error. The trial judge rejected this suggestion.

144 Ariz. at 459, 698 P.2d at 704. We agree.

Appellate counsel for Gerlaugh and our respected colleague in dissent fault trial counsel-in what sounds like a new rule precluded by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)-for not revisiting with his client the issue of such an examination after conviction and during the preparation for sentencing. The argument is that trial counsel should have pressed his client on this issue and tried to get him to change his mind. Trial counsel has no recollection of having made such an attempt. But even if we were to regard such a lapse as a mistake, it would be of no consequence in this case because we know what counsel would have found, and, on balance, we judge it to be potentially more harmful to petitioner than it could have been of substantial assistance in avoiding the death penalty. As the trial/post-conviction hearing judge and then the Arizona Supreme Court remarked, Dr. O'Brien's testimony revealed petitioner to be a person who associated with "wild companions" and who "sought out the company of lawbreakers for the thrill of hurting others and then escaping the consequences of his actions." 144 Ariz. at 461, 698 P.2d at 706. We agree with the Arizona Supreme Court that this evidence has "obvious countervailing tactical dangers for petitioner." *Id.* at 459, 698 P.2d at 704. In its best possible light, it is a basket of cobras. Accordingly, we can identify no prejudice flowing from counsel's failure to develop Dr. O'Brien's testimony. Had counsel pressed his client and discovered this information, it is highly likely that the damning report would have remained confidential. *See Bonin,* 59 F.3d at 834–36 (the use of expert psychiatric testimony opens the door to powerful cross-examination and rebuttal).

Parenthetically, given this court's approach to a lawyer's introduction of potentially damaging evidence against his own client, one would certainly understand the reluctance of counsel to introduce any two-edged swords into a case. *See Wade v. Calderon,* 29 F.3d 1312, 1323 (9th Cir.1994) (the introduction by counsel of damaging testimony against a client suggests ineffective assistance of counsel). Had trial counsel introduced Dr. O'Brien's testimony into this case, no doubt we would be hearing now a claim based on *Wade* that it was a serious mistake for counsel to have informed the sentencing court

that his client was a remorseless predatory bully who victimized innocent people for thrills and who killed for status. Only in an appellate context can a lawyer safely reveal such unflattering evidence about his client without immediately damaging him, and this is because on this issue, the lawyer is on trial, not the client.

Fourth and finally, to send this case back to the state trial court to hear the evidence counsel failed to develop or to introduce-including the three witnesses as well as the doctor-would be a looking-glass exercise in folly. The trial and sentencing judge has already considered *all* of this information in the post-conviction hearing and has held that none of it would have altered his judgment as to the proper penalty for Gerlaugh. And, the Arizona Supreme Court looked at the substance and results of the post-conviction proceeding and affirmed the trial judge in all respects. In effect, petitioner has already had what he is asking for-consideration in a formal hearing of this evidence. We respectfully decline to order the State courts to do again what has already been done.

 Petitioner does argue that because the trial judge was being asked at the post-conviction hearing to change his final judgment, he should have been disqualified. This argument is facially unsound. "It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." *Liteky v. United States*, 510 U.S. 540, 551, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474 (1994). If fashioned into a rule, Gerlaugh's argument would result in unnecessarily dislodging trial judges from post-conviction proceedings on the false assumption that trial judges are not capable of doing what the law requires. In our court, we have on rare occasion remanded cases to different trial judges, but never in circumstances as benign as presented in this case. Such a new rule of constitutional command not only makes no sense, but could not in any event apply to *Gerlaugh*. *See Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (a new constitutional rule of criminal procedure may not normally be applied to cases on collateral review). We cannot identify any fault with Arizona's rule that assigns post-conviction review matters to the original trial judge. *See State ex rel. Corbin v. Superior Court*, 138 Ariz. 500, 503, 675 P.2d 1319, 1322 (1984) (enforcing rule).

### 3.

#### The Failure to Plead for Leniency

 We move now to a nonevidentiary aspect of counsel's sentencing phase performance, the claim framed in *Cronic* terms that counsel's oral argument to the sentencing judge was so weak and deficient that, in effect, Gerlaugh was left without the Sixth Amendment representation to which he was entitled. Appellate counsel argues that this alleged failure to beg for leniency is presumptively prejudicial and requires a reversal, regardless of an absence of demonstrable prejudice. The argument is tantamount to a claim that such a discrete deficiency, although a trial error, is structural and thus evades harmless error analysis.

 At the outset, although we have discussed each aspect of Gerlaugh's claims against his lawyer separately, we do not believe it to be appropriate to segregate counsel's oral presentation on behalf of his client at the sentencing stage of the proceeding from the other measures taken on his behalf. Under the *Cronic* test, it is the *totality* of his efforts that we must examine, not just part of them in isolation. "[S]pecified errors made by counsel ... should be evaluated under the standards enunciated in *Strickland*." *Cronic*, 466 U.S. at 666 n. 41, 104 S.Ct. at 2051 n. 41. Accordingly, we examine the steps taken by counsel on Gerlaugh's behalf to try to protect his client from the death penalty; and we begin with counsel's explanation of his approach and strategy as he testified during the post-conviction hearing:

Q. Okay. Now, after Darick was found guilty of the first-degree murder, obviously the next step was to prepare for the aggravation/mitigation hearing; is that correct?

A. Yes.

Q. Did you ask either Darick Gerlaugh or any of his family members about possible sources of mitigating evidence?

A. Yes.

Q. And what did you do to try to develop mitigating evidence?

A. As I recall, I asked Darick and his family, that being his father and mother, for the names of people that I might contact or interview who would be available to testify in his behalf. This was a case of a great deal of concern to me because I was of the opinion that Darick being convicted of the crime would, without doubt, be sentenced to death.

So in order to make an attempt to save Darick's life, so to speak, and not have him sentenced to death, I was actually looking for mitigating witnesses who would find something unique about Darick. By that I mean that they knew something personal about him that was either a physical ailment or a mental problem that had gone untended to that may have created some problems with Darick that then created the situation that he got himself into in the murder of Scott Schwartz.

So I wasn't real pleased with the information I got back, because it all surrounded the—what I just termed the good guy syndrome. In other words, people had good things to say about Darick. You know, he was an enjoyable person. I believe someone said that he—I hope this is correct—that he babysat for their child and they had no problems leaving him with the child, that type of thing.

But I found no one who could come up with something unique that would help me fit him into a mitigating circumstance, a legal mitigating circumstance by law.

Q. In your criminal law practice, how many death penalty cases do you think you've handled, or potential death penalty cases?

A. Eight, I believe.

Q. And how many of those defendants actually received the death penalty?

A. Including Darick, there is John Adamson, and Robert Cruz received the death penalty, but his case has been reversed and he is now off of death row.

Q. And you said that you thought that this was a definite death penalty case. What made you arrive at that conclusion?

A. The manner in which the evidence came out at trial was basically establishing all of the—or a good many of aggravating circumstances that the statute covers. That my client had a prior conviction, which was a robbery, for which he could have been sentenced to life. That the killing was done with the expectation of some gain. That the killing was done in an especially cruel and heinous manner.

Those things came out, not only from the basic evidence in the trial, for example, the medical examiner, but also from the confession that Darick had given. Based on knowing what the statute called for and how Darick fit into that particular situation, I had no doubt that unless I could come up with something substantial that he would be given the death penalty.

Q. Prior to the trial itself, did you give any thought to—or did you explore or think about possibly an insanity defense?

A. In looking at that situation, I do recall talking with Darick about a psychiatrist, about psychiatric testimony. But I found—Darick was a very cooperative client. In my estimation he was a good client, someone that would help me and not just hinder me and give me problems as we went through the case.

But this one point I didn't find unusual, and that point is that Darick did not want a psychiatrist involved in the case. The reason I didn't find that unusual, I had represented other people who were Indian, that didn't want people prying into their minds. And I understood what Darick was saying about that.

It was obviously important to me because, very frankly, this case had no factual defense. It was a case of a legal

defense, trying to get the confession suppressed. And if I—in my opinion, if I had been successful in getting the confession suppressed, there was not sufficient evidence to convict Darick.

Q. Was there anything that you saw prior to trial that would have led you to believe that an insanity defense might be a viable defense?

A. No.

At the presentencing hearing conducted on February 4, 1981, counsel began on his client's behalf by attacking the applicability of two of the aggravating circumstances. He argued that because Mr. Schwartz's money was taken after the killing, no robbery had occurred. Counsel also argued that notwithstanding the gruesome evidence adduced at the trial, the killing of Mr. Schwartz was not cruel or heinous as compared to other murders because no evidence was offered that Gerlaugh and his companions intended Mr. Schwartz to suffer, or that he was tortured. Counsel argued that although the evidence taken in the light most favorable to the prosecution demonstrated "an intent to kill this person[,] . . . [t]here was no attempt to try to torture this person. Any of the acts that you may find to be atrocious was simply meant to murder the victim and not to actually make him suffer prior to then making the decision to simply kill him." Strongly implied in this argument, of course, is counsel's position that the death penalty was not appropriate for his client.

Counsel then called to the stand Gerlaugh's parents, both of whom testified in mitigation that their son had been while growing up a model baby-sitter; a companion to an elderly woman; a Cub Scout; a squad leader in the Boy Scouts "moving to an Eagle Scout"; especially kind to animals, dogs, and guinea pigs; a normal family member; good to his sister; a worker; but also someone who seemed to fall under the bad influence of his codefendant, Matt Leisure, and then marijuana.

We reiterate here that prior to the presentencing hearing, counsel asked his client and his client's family for a list of witnesses who would be willing to testify on Gerlaugh's behalf. The record shows that he tracked down these leads, caused them to be interviewed, and then called to testify the witnesses he believed would be most helpful. He submitted materials regarding the others to Mr. Ed Delci of the Adult Probation Department so that Mr. Delci could include their statements in a supplemental presentence report.

Moreover, counsel vigorously took exception to the conclusions in Mr. Delci's written work to the effect that Gerlaugh showed no remorse for his criminal behavior. Counsel argued directly to the court on behalf of Gerlaugh that Mr. Delci's report was defective, that his client did accept responsibility for what he had done, and that he did demonstrate remorse in his own way. Furthermore, counsel emphasized his client's age as "one large mitigating factor" in connection with court's decision as to his sentence and assaulted Mr. Delci for not doing a thorough job. Here is what counsel had to say in this connection on behalf of his client.

MR. FELDHACKER: Thank you. One of the basic reasons I wanted to make some comments today as opposed to waiting is because I have had an opportunity to talk to Ed Delci who is doing the presentence report or who did the presentence report.

THE COURT: The record may show he is present, I believe.

MR. FELDHACKER: Fine. It was my impression that an additional or supplemental report was going to be prepared or, at least, additional information was going to be given to the Court. I forwarded just a brief synopsis of some interviews of some people who had contact with Darrick and was concerned that they be made available to the Court through the Probation Department. Mr. Delci did ask me if I had a written-type recommendation to give as [the prosecutor] Mr. Imbordino did, but I advised him that I did not and that I would simply make my remarks to the Court. So, I am hoping—I only have one copy of that with me. It has some notes on the back so I can't provide the Court with it today, but, perhaps, if he has received it and is able to provide the Court with it,

fine. If not, I will get another copy to the Court.

THE COURT: I will only state that the Probation Officer does not have it. I will have my bailiff make a copy of it before you leave today so I will have it.

MR. DELCI: I don't have it with me. The preparation of the supplemental report is in progress. It will be available, including the materials that have been received.

MR. FELDHACKER: Fine. Thank you. I thought there was one forthcoming.

I am not sure, of course, what all is going to be in the supplemental report, but there is a couple of things that struck me as I read through the report and it concerned not only the report that's before the Court at this time, but also the presentence report that was written as to my client on his previous conviction of the robbery charge.

And, that was that in both cases the presentence officers have indicated that they saw no particular remorse in my client for either of the acts, for example, this homicide that occurred or for the robbery that occurred in the past.

I think in the reports, in reading them, they show, obviously, that my client is accepting the responsibility of what occurred and what his acts were. But, again, they simply relate in their opinions a lack of remorse.

The thing that concerned me about that is just to tell this Court that there is no remorse. I thought, surely, someone might want to go a little deeper in that or into that or are we just saying, everyone must show remorse in the same way that, perhaps, you and I might expect someone to, by either expressing outwardly the sorrow or by, you know, outwardly showing physical appearances of remorse; crying, whatever.

And, it seems to me a little superficial just to say that I see the facts of this case. It is a brutal killing. It is a atrocious killing and, therefore, he must receive the death penalty. I don't know if the Court had any further questions about, you know, who is Darrick Gerlaugh, what brought him to this point to let me decide whether or not he should live or die. We know, obviously, one large mitigating circumstance to Mr. Gerlaugh has is his age. The Court can take that into consideration, but I think that is the only obvious one, that I have a young client. And, he was young at the time of the commission of this act. But, I really found nothing and, again, I don't know if the Court wanted any more, but it disturbed me to the point to where I wanted to address myself to it. That I think there should be something more before this Court. Whether it is incumbent upon people who find my client has no remorse to say, I think, perhaps, he should be looked at so we can get, possibly, a psychiatric evaluation to determine whether or not, you know, what his make-up is, whether or not there is a remorseful situation involved here and what brought him to commit the acts that occurred. There just doesn't seem to be anything, at all, about that.

I didn't feel and I still don't, that I am in a position to tell this Court that my client needs psychiatric evaluation for understanding what is going on during his trial, understanding what is going on today or what will go on at his sentencing, because I know he does understand. He knows by his communications with me what these proceedings are and why they are occurring. And, yet, I just wanted to address myself to that as to whether or not the Court is going to consider that it wants or desires that further information—I am not telling you that I think there is a legal ground for it, I am not saying that I think that it is error for this Court to sentence him without that type of further information, but I was also disturbed on the fact that there was no contact with my client's family, no attempts to go out and see something more. Is there something more to give to this Court as far as mitigating circumstances of my client?

That is my job. I have done as best as I can. It is a decision. Many people are aware of the facts of this killing and are concerned about giving the Court further information.

THE COURT: I was going to inquire. Isn't that one of the purposes of this hearing, to enable the defendant to bring forth to the Court any of the information that he feels has not been presented?

MR. FELDHACKER: Absolutely, without a doubt, that is why I am saying, that is my responsibility here today, as well. But, again, I think we all have in the Probation Department as well as defense counsel to give this Court as much information as they can about the person.

And, really, those are the only comments I have at this time as far as just making the Court aware of my feelings as to whether or not the Court might want further information on this particular case based on the fact that I think that, you know, reading the probation report, it seems to be a terrible crime in that I have never seen anything this bad before. Everyone recommends death, therefore, obviously, there is nothing good to say. That's the end of it.

I just believe that as an officer of the Court, which I am, which the Probation Officers are, there is a little greater obligation there as opposed to simply saying, my client has no remorse.

I can stand here and tell you, Your Honor, about any remorse my client may have, but, again, Mr. Imbordino can stand up and say, he has never shown any, so, he doesn't have any. Those are just words that are coming from people that are deeply involved in this and I, really, believe that if this Court thinks that it's decision may tip, at all, on whether or not my client is simply so cold-blooded and committed a cold-blooded murder or had a remorseful situation, whether it be right afterwards or at this point in time, then I think the Court might consider asking for a psychiatric evaluation and testing.

THE COURT: Certainly, I would be happy to listen to anything you have to say regarding your opinions or expressions on remorse you, certainly want to inform the Court of.

MR. FELDHACKER: A lot of times there are real problems when we address the Court in an attorney-client relationship-

THE COURT: I understand.

MR. FELDHACKER: It makes it difficult. Today I don't have anything that I am going to say to the Court about that, and -

THE COURT: If what you are telling me is that not all people show remorse in the same ways -

MR. FELDHACKER: I sincerely believe that.

THE COURT: I, certainly, might be inclined to agree with that statement.

MR. FELDHACKER: That is all I have, Your Honor.

THE COURT: Mr. Imbordino.

MR. IMBORDINO: Your Honor, the only thing I would address myself to at this time would be the comment that Mr. Feldhacker on his client's remorse stated.

I think that is apparent, the lack of remorse, is apparent from the statements that he made to the Probation Officer in preparation of the report. The report refers to the statements made by the defendant at the time he was arrested, when he was asked the question by the police officers, how he felt about killing Mr. Schwartz. And, Mr. Gerlaugh said, "It was just like killing an animal." He showed no remorse at that time to those police officers.

He was questioned by the Probation Officer on the same thing and, apparently, showed the same lack of reaction, the same lack of remorse.

All I can say is that if he felt it, I don't know whether it is important to this Court, whether or not he feels remorse, but he, certainly, has had an opportunity to express it and he didn't do so.

I, specifically, during the trial did not bring out those very statements of the defendant because I felt since I was trying two defendants at the same time I didn't want to unduly prejudice Mr. Encinas with the remarks of Mr. Gerlaugh, but I think it is evident from the report that they were made and Mr. Gerlaugh has admitted to making them.

THE COURT: Mr. Imbordino, I will only say this, that in matters of this nature I cannot conceive of anything more serious. Every factor is important to this Court and the Court is going to make its determinations based on all the information I have available to me and in accordance with the statutes.

On the judgment day, counsel made another attempt to derail the death penalty by waiting until sentence had been imposed on the non-death charges and then interrupting with a claim of double jeopardy.

THE COURT: No legal cause appearing, as to Count One [armed robbery], it is ordered that you be committed to the Department of Corrections for a period of 21 years. As to Court Two [kidnapping], it is ordered that you be committed to the Department of Corrections for a period of 21 years. The sentencing on each count shall run concurrently; however, for the reasons that I have just stated as to aggravating circumstances, the sentences as to Counts One and Two shall run consecutively to the sentences imposed in cause number 103047, and as to Counts One and Two in cause number 110814, you shall be given credit for 377 days that you have served in incarceration prior to sentencing.

As to Count Three, no legal cause appearing-

MR. FELDHACKER: Judge Brown, as to Count Three, I think I would like to state something as to legal cause on that.

THE COURT: Proceed, please.

MR. FELDHACKER: For the record, I believe that now that the Court has entered judgment of guilt and sentence as to Counts One and Two, the Court is now prohibited from sentencing my client on Court Three, *Harris v. Oklahoma*, which is 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054, a 1977 case wherein the case clearly shows that a conviction for a felony murder bars a trial even for underlying felonies. What they are talking about of course is that where you have a case where someone is charged with armed robbery and then also charged with a murder felony that you cannot try and convict them on all of those counts.

This court might be well aware of the fact that I made a record many times on the fact that this Court should consider demanding prosecution elect which theory he was going to the jury under, whether it was premeditated murder or murder felony. This Court did not do that.

I then later asked the Court to give the jury separate forms of verdict so that we would know what kind of verdict they came back with, whether it was premeditated murder or whether it was murder felony.

This Court did not do that, therefore, again I think we are left in a dilemma that I think must be resolved in favor of my client wherein the Court by virtue of double jeopardy cannot now sentence my client on murder first degree since the Court has sentenced him on the two lesser underlying cases of armed robbery and kidnapping, all arising out of the same circumstance.

That's all I have as far as the record is concerned, Your Honor.

THE COURT: Mr. Imbordino.

MR. IMBORDINO: I have no reply on it, Your Honor.

THE COURT: I take it this amounts not only as objection to the legal cause from proceeding with sentencing, but in effect a motion to dismiss at this point the finding of guilt and judgment of guilt entered by the Court and to that extent, your request and motion is denied.

The Court will proceed with sentencing as to Court Three.

Although this attempt failed, it conclusively demonstrates that counsel had neither deserted nor forsaken his client, and that as an adversary he was reaching for everything he could think of, even straws. We note that a similar claim of double jeopardy was filed as Claim 7 in the district court as part of this petition, but abandoned on appeal. We are not satisfied in *Cronic* terms that counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 659, 104 S.Ct. at 2047.

Gerlaugh argues that his trial counsel was *required* by the Sixth Amendment to ask the

sentencing court for leniency. This claim has no merit. When we examine as we must this alleged nonstructural deficiency for prejudice, we see clearly that no amount of theatrics could have made any difference in this case. Darrick Gerlaugh sentenced himself to death when, while on probation for robbery, he mounted and led a savage and relentless attack on Scott Schwartz designed to kill his victim and to save himself from prison. Gerlaugh knew full well from previous experiences with the law what awaited him if he left a live victim behind. When a vicious beating couldn't accomplish his merciless objective, Gerlaugh used Mr. Schwartz's own car to run him down, over and over. One can only imagine the terror Gerlaugh's helpless and outnumbered target must have felt as he scrambled for his life on that lonely road. But ramming Mr. Schwartz with a moving vehicle was not enough either, so Gerlaugh decided to shred him to death by placing the car's tire and its weight on him, while Mr. Schwartz was still alive, and then popping the clutch. How Mr. Schwartz managed to survive this brutality is hard to comprehend, but he did. A single-minded Gerlaugh, however, was not finished. As Mr. Schwartz pleaded for his life, Gerlaugh located a screwdriver and repeatedly plunged it into Mr. Schwartz's face and neck until he drained him of his courageous hold on life and his tenacious will to survive. One need not ponder at length to realize what fate awaited Mr. Roche had he not escaped. Live robbery victims were not on Gerlaugh's agenda, especially those who could place him in the vicinity of the Schwartz murder.

Against this barbaric behavior, Gerlaugh could muster no substantial mitigating circumstances, and he has been unable to do so to this date notwithstanding the dogged efforts of his able attorneys. The best his parents could do was suggest that in his younger days, he had been kind to his elders, to dogs, and to rodents. To review this scenario and to examine the photographs of the screwdriver wounds on Mr. Schwartz's battered and mutilated corpse, all for $37.00, leaves us with a thorough understanding of why the trial court said, "The crime and particularly the manner of its commission was shockingly evil and grossly bad as well

as being marked by debasement and precision.... This offense absolutely demonstrates the defendant's total lack of regard for human life or human suffering." In turn, the Arizona Supreme Court said in its independent review of the evidence regarding aggravating and mitigating circumstances:

It is obvious that the evidence in this case takes it far beyond the norm in homicides. The imposition of the death penalty here cannot be characterized as an arbitrary and capricious imposition of that penalty. As this case appears to be an example of the most extreme factual situations with virtually no mitigation, no useful purpose would be served in comparing, discussing or citing other homicide cases.

We affirm the imposition of the death penalty.

State v. Gerlaugh, 135 Ariz. 89, 90, 659 P.2d 642, 643 (1983).

Given all of this, we are confident that no plea for mercy or leniency on Mr. Gerlaugh's behalf, indeed no oral argument on his behalf, could have altered what Mr. Gerlaugh himself set in motion. Even Gerlaugh's age does not help him because he was adjudged mature by the trial court. Under Arizona law, the implications of the age of a defendant are considered in the light of his prior criminal history. In discussing whether Gerlaugh's age was a substantial mitigating factor, the Arizona Supreme Court noted that

Petitioner had previously been convicted of armed robbery at the age of 17. Four days before the murder in this case, petitioner participated in a similar armed robbery, kidnapping, and attempted murder with codefendant Matthew Leisure. See State v. Gerlaugh [Memorandum Decision, No. 1 CA–CR 5309, filed June 10, 1982]. Petitioner and Leisure forcibly entered the car of Tobin Gentry at gunpoint. After driving to an isolated desert location, the victim was forced to lie on his stomach. Petitioner told Leisure to "do a good job, make sure" and Leisure then pumped four bullets into the victim's back.

144 Ariz. at 461, 698 P.2d at 706 (brackets in original). Parenthetically, this incident gives

considerable substance to Gerlaugh's analogy of killing game to killing people.

Accordingly, Gerlaugh can show no prejudice from his attorney's sentencing performance, and "no substantial and injurious effect or influence" from anything counsel did or did not do. *Brecht v. Abrahamson,* 507 U.S. at 623, 113 S.Ct. at 1713–14. Even without the deference or the presumption of adequate assistance mandated by *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065, we cannot identify any aspect of counsel's performance that "so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. Faulting counsel for failing to plead for his client's life would inject a mandatory element requirement into final argument, which is not evidence, and would "narrow the boundaries of acceptable argument style too much." *Hendricks v. Calderon,* 70 F.3d 1032, 1045 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996). As the Supreme Court said in *Cronic,* "If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." 466 U.S. at 656 n. 19, 104 S.Ct. at 2045 n. 19.

### 4.

#### Summary

In conclusion, regarding the evidentiary aspect of counsel's performance in connection with his client's presentencing hearing, we find no separate or cumulative deficiencies, but even assuming the worst, no prejudice. Moreover, given the facts and circumstances of this case, counsel's overall performance at the sentencing proceeding was not deficient either. *Compare Cooper v. Fitzharris,* 586 F.2d 1325, 1333 (9th Cir.1978) (observing that "prejudice may result from the cumulative impact of multiple deficiencies"). But again, even if we look at it in the worst possible light, we are unable to discover any prejudice to Gerlaugh. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. He is unable to show that absent the "errors" of which he complains, "the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069. The hard record had been made, the die had been cast, and we cannot conceive of *any* rhetorical flourish that could have made a difference. As we see the record, counsel's task was virtually impossible. He did not abandon the defense of his client, and he did the best he could with a horrific case. His performance during the guilt phase was vigorous and intelligent. If the mouthpiece has no trumpet, blowing with all one's might will not tear down any walls.

### B.

■ Petitioner contends next that the statutory aggravating factor of an "especially heinous, cruel, or depraved" homicide, used to support Gerlaugh's sentence of death, *see* A.R.S. § 13–703(F)(6), is too vague to survive scrutiny under the Constitution, and that it had not been given an adequately narrow construction by the Arizona Supreme Court prior to this case which would enable it to escape this defect. In the vernacular of the profession, this issue has come to be known as the (F)(6) issue. *See Walton v. Arizona,* 497 U.S. 639, 690, 110 S.Ct. 3047, 3076–77, 111 L.Ed.2d 511 (1990) (Blackmun, J., dissenting). However, it is no longer novel and has been authoritatively settled not only by the Supreme Court in *Walton,* but recently by this circuit in *Woratzeck v. Stewart,* 97 F.3d 329, 333 (9th Cir.1996): the Arizona Supreme Court adequately narrowed the (F)(6) factor not in 1983 in *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983), but in earlier cases decided prior to 1978. *See State v. Mata,* 185 Ariz. 319, 324, 322–327, 916 P.2d 1035, 1040, 1039–43 (1996) ("*Gretzler* did not present a new, narrower interpretation of the (F)(6) factor, but simply a digest of the previously legitimate applications of the factor."). Thus, because Gerlaugh's final sentencing occurred after *Gretzler,* we are satisfied that he received the benefit of the properly narrowed construction of the (F)(6) factor as approved by the Supreme Court in *Walton.* Finally, the record demonstrates that petitioner's assertion that there was no adequate finding of the (F)(6) aggravating factor is plainly without merit. Both the trial court and the

Arizona Supreme Court adequately addressed this requirement.

### C.

■ As to a second aggravating factor that the offense was committed for pecuniary gain, see A.R.S. § 13–703(F)(5), petitioner complains (1) that the evidence adduced at the trial did not support the finding, (2) that the facts relevant to this factor were inappropriately considered as to both the (F)(5) and the (F)(6) factors, and (3) that the Arizona Supreme Court "wholly dispensed with conducting an independent review" of this factor. The record does not support these allegations. We note as did the district court that the sentencing court said the following in a special verdict:

> 5. Based upon the recent decisions of the Supreme Court of Arizona interpreting this aggravating circumstance and the fact that the evidence at trial clearly shows that you intended to obtain and did obtain money from the victim as well as the victim's automobile, the Court finds that the defendant did commit the offense as consideration for the receipt or in the expectation of the receipt of something of pecuniary value.

This finding is clearly supported by the petitioner's confession and was adequately reviewed and affirmed on appeal. Moreover, the question of double counting not only is not supported by the record, as observed by the district court, but is a matter of state law and not cognizable in this forum.

### D.

■ A third aggravating factor rendering Gerlaugh eligible for the death penalty is his prior robbery conviction for which "a sentence of life imprisonment or death was imposable." See A.R.S. § 13–703(F)(1). Gerlaugh's complaint is that three months *after* his conviction in 1978 for robbery, the Arizona legislature reduced the penalty for robbery to a maximum of five years.

There is no doubt that Arizona law permits the use of Gerlaugh's prior robbery conviction in connection with the (F)(1) factor, *see State v. Tittle*, 147 Ariz. 339, 343, 710 P.2d 449, 453 (1985); and that ends our inquiry. There is nothing about the change in the maximum sentence for robbery *after* Gerlaugh's conviction that makes the use of the life sentence he was actually given offensive or arbitrary under the Constitution.

### E.

■ Petitioner claims that neither the trial court nor the Arizona Supreme Court properly considered the statutory mitigating circumstances advanced on his behalf. The district court parsed out this assertion and the evidence to which Gerlaugh points, and found the claim to be wanting. So do we. We find in the record adequate consideration of his age, use of intoxicants, cooperation with the police, intent, good character evidence, and the life sentence of his unequally-culpable codefendant. Guided by our holding in *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir.1992), that "[t]he due process clause does not require that the sentencing court exhaustively document its analysis of each mitigating factor as long as a reviewing federal court can discern from the record that the state court did indeed consider all the mitigating evidence offered by the defendant," we conclude that due process is satisfied. *See also Parker v. Dugger*, 498 U.S. 308, 314, 318, 111 S.Ct. 731, 735–36, 112 L.Ed.2d 812 (1991) (statement by sentencing court that it considered all mitigating evidence adequate); *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (no due process violation where it was evident that the trial court considered all mitigating evidence), *cert. denied*, 514 U.S. 1071, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1995).

### F.

Gerlaugh's complaint that he was denied a "meaningful proportionality review" is belied by the record. The Arizona Supreme Court held that Gerlaugh's sentence was proportional to the sentences imposed in other cases, *see State v. Gerlaugh*, 135 Ariz. at 90, 659 P.2d at 643; and the Supreme Court has held that we have no warrant to "look behind that conclusion." *Walton*, 497 U.S. at 656, 110 S.Ct. at 3058; *Martinez–Villareal v.*

*Lewis,* 80 F.3d 1301, 1309 (9th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996).

### G.

█ Petitioner next attempts to elevate alleged errors in Arizona's post-conviction relief proceedings to federal constitutional status. This attempt fails under *Franzen v. Brinkman,* 877 F.2d 26, 26 (9th Cir.1989), where we held that errors concerning such a process are not cognizable in federal habeas proceedings.

### III

#### Counsel's Performance on Appeal

█ Gerlaugh's counsel made a deliberate tactical decision on appeal to address only those issues that related to the conviction that rendered his client eligible for the death penalty. Counsel's objective was to render his client's confession inadmissible and thereby to win a new trial. His best professional assessment of the case was that if his client suffered a conviction as charged, a sentence of death was almost inevitable. We find no fault with this assessment. With this diagnosis in mind, he did not address any issues pertaining to sentencing. He did so with the understanding that Arizona statutory law required the Arizona Supreme Court to make an independent examination of the propriety and legality of the death penalty. The district court correctly viewed counsel's decision as a valid tactical choice not to dilute strong arguments with weak ones. *See Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983) (recognizing the importance of "winnowing out weaker arguments on appeal"); *Hendricks,* 70 F.3d at 1042 ("The choice to pursue a bad strategy makes no comment on an attorney's judgment where no better choice exists."); *Miller v. Keeney,* 882 F.2d 1428, 1434 n. 10 (9th Cir.1989)(defense counsel does not have a constitutional duty to raise all nonfrivolous issues). Moreover, we agree also with the district court's view that the Supreme Court's thorough independent review, *see* 135 Ariz. 89, 659 P.2d 642, erases any probability that the fate of Gerlaugh's appeal would have been different had counsel raised in that forum the penalty-phase issues that are raised here.

AFFIRMED.

REINHARDT, Circuit Judge, concurring and dissenting:

While I agree with the majority that we should affirm Darrick Gerlaugh's conviction, I do not agree that we can ignore his counsel's failure to make any argument as to why the death penalty should not be imposed—indeed to make any closing argument at all during the penalty phase of Gerlaugh's capital proceeding. Gerlaugh simply did not receive the constitutionally required effective assistance of counsel at the most critical stage of the proceeding—at a time when he most needed that assistance. Under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), reversal is required. Accordingly, I dissent from the majority's decision affirming the death sentence.

In its opinion, the majority makes two fundamental mistakes. First, the majority erroneously characterizes counsel's comments to the court during the presentencing hearing as an argument on Gerlaugh's behalf—an argument regarding whether Gerlaugh ought to live or die. In fact, counsel was merely addressing a procedural question; he was simply trying to call the court's attention to inadequacies in the presentence report and to request that the probation office conduct a further investigation before it submitted its final report. Thus, the majority erroneously concludes that Gerlaugh's counsel made a closing argument when in plain fact he did not. Second, the majority incorrectly asserts that we cannot consider the closing argument at the penalty phase as a separate stage of the proceeding for purposes of *Cronic,* when it is clear that we must. As a result, the majority fails to recognize that Gerlaugh did not receive effective assistance of counsel at "a critical stage of the proceeding," and that under *Cronic,* reversal of his sentence is mandated.

### I. Counsel Failed to Make a Closing Argument

There can be no doubt that, although counsel may have performed his functions in

some manner or other during the first part of the presentencing hearing—whether effectively or ineffectively—when the time came to make a closing argument he simply abandoned his responsibility to his client and remained silent.[1] Gerlaugh was thus left alone and unaided during the final and, as is frequently the case, the most critical stage of his capital proceeding. No one challenged on Gerlaugh's behalf the government's position that he ought to be executed. No one urged the court to take into account his youth or intoxication or lack of prior criminal history or other extenuating circumstances. No one asked the court to impose a lifetime sentence. *No one argued that Gerlaugh did not deserve to die for his crime.*[2]

Apparently because they believe strongly that Gerlaugh deserves to be executed, my colleagues in the majority advance the peculiar argument that requiring counsel to argue against the imposition of a capital sentence is equivalent to requiring him to plead for leniency. Whether or not one may properly so characterize the requirement that a capital defendant's counsel present whatever argument can be made to counter the state's request that he be sentenced to death, that requirement simply reflects a basic tenet of the adversarial process—that the defendant's interests be represented before the court. That is precisely the obligation of defense counsel, particularly when the issue is his client's right to live.

By its half-hearted efforts to defend counsel's comments during the presentencing hearing and portray them as a closing argument, and in its ultimate conclusion that the Constitution does not require counsel to plead for his client's life, the majority reveals a fundamental misunderstanding of counsel's role in the adversarial process. What Gerlaugh was clearly entitled to, and what he did not have, was a lawyer who took a position opposite to the government's—a position favorable to Gerlaugh's interests—an advocate for his right to live. When the state argued for death, defense counsel was supposed to argue for life. Yet at no point in his confused and maundering dialogue with the court at the presentencing hearing did counsel make any attempt (even an ineffective one) to challenge the government's position that Gerlaugh deserved to die. That was neither counsel's purpose nor his intent during that hearing. Because, as it turned out, the presentencing colloquy was the only colloquy that counsel ever engaged in that related in any way to what sentence should be imposed,[3] Gerlaugh was worse off than if counsel had not been present at all. Had there been an actual absence of counsel at the presentencing hearing (and at the sentencing hearing), Gerlaugh would at least have recognized that he needed to plead for himself.

The transcript of the presentencing hearing makes clear that counsel never intended to present a closing argument at that hearing; that he never intended to explain at that hearing why his client did not deserve the death penalty. One need only read counsel's rambling colloquy with the court, which is quoted almost in full by the majority, to understand that the only point counsel ever intended to make at that hearing, and the only subject he actually discussed at that time, was his contention that the presentence report was inadequate and that further investigation was necessary before the final report was submitted. At no point did Gerlaugh's counsel challenge the government's desire to have Gerlaugh executed, nor did he purport to discuss how the factors the court was required to consider should be weighed or what concerns should influence the court in reaching its ultimate decision. He made no effort to influence the court with respect to its task of weighing the aggravating factors against the mitigating circumstances and

---

1. I do not consider here whether counsel provided effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), when he conducted his investigation and questioned the witnesses he called during the penalty phase. That question is wholly irrelevant to the issue on which I base my dissent.

2. While the closing argument could have been made either at the presentencing hearing or at the following hearing, the actual sentencing, counsel did not make an argument on either occasion.

3. *But see infra* note 4.

of making a life-or-death judgment in the exercise of its discretion. He sought only to complain about the presentence report and to obtain a more thorough and more helpful supplemental report for use in connection with the ultimate sentencing process.

Notwithstanding the clear record to the contrary, the majority represents that counsel made several arguments in an effort to save his client's life. My colleagues are not correct: there's simply no there there. The statements to which the majority refers did not constitute and were not intended to constitute an argument regarding whether or not Gerlaugh should die, and none of them constituted or was intended to constitute any sort of argument for the imposition of a lifetime sentence. Although counsel spoke of mitigating factors that were absent from the presentence report, the clearly expressed purpose of his entire presentation was not to convince the court that the mitigating factors outweighed the aggravating factors, but rather that the presentence report inadequately treated those subjects and that the probation department needed to do more work before the sentence could be determined properly.

From the very beginning of counsel's comments to the court, he made it clear that he did not conceive of the presentencing hearing as the time for closing argument. Immediately after the conclusion of witness testimony, counsel expressed his intent to comment specifically on the report's shortcomings. He stated to the court: "At this time, Your Honor, I have no further witnesses to present to the Court. I have some comments that I would make." The court reminded counsel that he would have the opportunity to make comments during the sentencing hearing. However, counsel then explained the purpose of the remarks he intended to make, stating: "One of the basic reasons I wanted to make some comments today as opposed to waiting is because I have had an opportunity to talk with Ed Delci who is doing the presentence report." After the court observed that Mr. Delci was present in the courtroom, counsel stated: "I'm not sure what all is going to be in the supplemental report, but there [are] a couple of things that struck me as I read through the report."

Counsel then proceeded to present his analysis and criticism of the report that had been submitted and to voice his concerns about the sort of information that should be included in the supplemental report Mr. Delci was in the process of preparing.

Counsel questioned, for example, whether the initial report was as thorough as it should be with respect to his client's apparent lack of remorse. While the majority would have us believe that "counsel vigorously took exception to the conclusions" in the presentence report, even if he had that would not change the fact that he was simply addressing the quality of the report and what remained to be done in the supplemental report. The fact is, however, that the only exception counsel took to the report's conclusions was that they were premature—counsel did *not*, as the majority asserts, "argue directly ... that his client did accept responsibility for what he had done, and that [Gerlaugh] did demonstrate remorse in his own way." Counsel never even told the court that the presentence report was inaccurate; instead, he made clear in his bumbling way that his purpose in commenting was limited to persuading the court that obtaining further information was desirable:

> [T]hose are the only comments I have *at this time* as far as just making the Court aware of my feelings *as to whether or not the Court might want further information* on this particular case based on the fact that I think that, you know, reading the probation report, it seems to be a terrible crime in that I have never seen anything this bad before.

Counsel's admission that he, an experienced capital trial lawyer, had never seen anything this bad before could not have been part of an attempt to convince the court to impose a life sentence. Moreover, although he mentioned possible mitigating factors that were absent from the report, counsel did not ask the court to consider these factors in determining the sentence to be imposed. What he was interested in was a different subject entirely—what further information might be brought before the court.

The majority, in arguing that counsel did not abandon his client, clings to counsel's

reference to Gerlaugh's age and argues that he raised youth as a mitigating factor. Indeed, the majority would have us believe that counsel "emphasized his client's age." Op. at ——. There can be no doubt that *if* Gerlaugh's attorney had made a closing argument, he would have relied in significant part on his client's age—it is an important mitigating factor. But that's not what happened here. Instead, counsel simply pointed to his client's age, and he did so for an entirely different purpose. Counsel did not argue that Gerlaugh's youth was a mitigating factor; rather he pointed out that age was the only *obvious* mitigating factor in order to demonstrate the report's inadequacy—because age was the only factor the report identified. As counsel noted in discussing the presentence report:

> And, it seems to me a little superficial just to say that I see the facts of this case.... We know, obviously, one large mitigating circumstance that Mr. Gerlaugh has is his age. The Court can take that into consideration, but I think that is the only obvious one, that I have a young client. And, he was young at the time of the commission of this act. But, I really found nothing [in the report], and, again, I don't know if the Court wanted more, but it disturbed me to the point to where I wanted to address myself to it. That I think there should be something more before this Court.

Counsel was clearly referring to the report and what should be, but was not, in it. He was not trying to persuade the court that Gerlaugh's youth should preclude a death sentence, nor was he urging the court to take his client's youth into account in the sentencing decision. He was simply saying that there should be more than that about the mitigating factors in the report.

When counsel suggested that the "something more" in the report should be a psychiatric evaluation, the court explained to him that "I would be happy to listen to anything you have to say regarding your opinions or expressions on remorse you[ ] certainly want to inform the Court of." Counsel made a stuttering attempt to respond to the court's

invitation to argue about his client's remorse, but quickly begged off: *"Today* I don't have anything that I am going to say to the Court about that." The natural implication of counsel's refusal to speak on the subject of remorse, like the natural implication of the rest of his remarks, was that he was saving his arguments for another day, that he was saving them for the sentencing hearing when the supplemental report would have been prepared and submitted to the parties and the court.

The entire colloquy between Gerlaugh's counsel and the trial court during the presentencing hearing makes it abundantly clear that counsel did not intend to present his closing argument to the court until he had the supplemental report in hand. It is therefore astonishing that at the sentencing hearing, after the supplemental report had finally been completed and filed, counsel still failed to present *any* closing argument on his client's behalf. The following reflects the entirety of defense counsel's comments preceding Gerlaugh's sentencing:

> COURT: [Counsel], do you have anything to say?
>
> COUNSEL: Your Honor, I have reviewed both presentence report and the supplemental report, and I think they contain all the matters this Court should consider at this time, and I have nothing further to say.

Incredibly, counsel made no attempt whatsoever to challenge the apparent presumption on everyone's part (possibly even his own) that Gerlaugh deserved a death sentence; nor did he explain what the mitigating circumstances were (and there were several). Rather, at the crucial point in the proceeding, counsel said *absolutely nothing* on his client's behalf.

In sum, at the presentencing hearing, counsel chose to discuss only what further work needed to be done on the supplemental presentence report, and that's all. At the sentencing hearing, he said nothing whatsoever. As a result, *no* closing argument was ever made on behalf of Gerlaugh during the penalty phase of the proceeding.[4]

---

4. During the sentencing hearing, after the court

began to impose Gerlaugh's sentence, counsel

The majority's conclusion that counsel did not abandon Gerlaugh during closing argument is obviously influenced by its view that any effort at a closing statement would have been useless. In effect, the majority argues that counsel did not desert his client because there was no argument to be made on the client's behalf. I strongly disagree, both practically and legally. In *any* case there are arguments to be made on both sides. In *this* case there were several significant mitigating factors that counsel could have urged upon the court as reasons for deciding not to impose the ultimate punishment. He could have explained why these factors warranted the exercise of judicial discretion in favor of sparing Gerlaugh's life. Instead, he said nothing. *See also Herring v. New York*, 422 U.S. 853, 860, 95 S.Ct. 2550, 2554, 45 L.Ed.2d 593 (1975) (discussed *infra* at Part II.A.).

Balancing the factors—mitigating and aggravating—involves the exercise of judicial discretion and judgment. When such balancing is required, it is the duty of defense counsel to argue why the balance should be struck in his client's favor. No matter how great the odds may seem to be against winning the argument, counsel must make the best case he can. It is not counsel's role to act as judge as well as advocate, any more than it is the district court's or this court's role to say, "Oh well, his client would have lost anyway. He had a bad argument, so there's no need for him to make any argument at all—no need to advocate—no need for representation by counsel." That kind of reasoning is squarely contrary to the elementary precepts of the adversary system.

That counsel misunderstood the nature and importance of his role in the adversarial process and the extreme consequences that flow from abandoning one's client at a critical stage of the proceeding is further demonstrated by his actions after the death sentence was imposed. On appeal, counsel once again failed to make any argument that Gerlaugh should not have been sentenced to death. This could not have been a strategic decision by counsel. He could not reason-

ably have decided to focus exclusively on the obviously losing issues related to Gerlaugh's underlying conviction, particularly as the appellate court was *required* to reweigh the mitigating and aggravating circumstances irrespective of whether Gerlaugh actually raised the issue. Thus, unlike most deficient counsel, Gerlaugh's counsel had a second clear chance. Indeed, on appeal, the validity of the sentence was the *only* issue that the law specifically required the court to consider. Nevertheless, counsel continued to remain silent—to refrain from making any argument. As in the trial court, counsel did not act as an advocate for his client on the sentencing issue, but instead persisted in the belief that he had no responsibility to question the sentencing judge's determination to impose the ultimate punishment on Gerlaugh. By doing so, he again accepted a death sentence for his client without engaging in the adversarial process and again assured that his client would be put to death—unless, of course, a later court was careful enough in its analysis and committed enough to applying the law properly to recognize that he had abandoned his obligations as counsel.

## II. Counsel's Silence Constitutes a Cronic Violation

### A.

Counsel's failure to make a closing argument during the penalty phase of the trial denied Gerlaugh representation by counsel at a critical stage of the sentencing proceeding in violation of the basic constitutional principles set forth in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Such a violation necessarily calls into question the reliability of the proceeding; under *Cronic* we must presume that Gerlaugh suffered prejudice as a result and are required to reverse his death sentence. According to the majority, however, counsel's abandonment of his client by failing to make a closing argument at the penalty phase cannot by itself establish a *Cronic* violation because it is not "appropriate to segregate counsel's oral presentation on behalf of his

---

interrupted and raised a weak, indeed frivolous, double jeopardy argument, which the sentencing

judge immediately and correctly brushed off.

client at the sentencing stage of the proceeding from the other measures taken on his behalf." Op. at 1036. My colleagues' position is directly contrary both to established law and to basic Sixth Amendment requirements. Instead of viewing the second half of Gerlaugh's bifurcated trial as an inseparable whole for the purposes of *Cronic*, as the majority insists upon doing, the law requires us to treat closing argument as a critical stage of the proceeding in and of itself. It does not matter that the absence of closing argument occurred at the penalty phase of the proceeding as opposed to the guilt/innocence phase. Both phases provide the opportunity for closing argument, and closing argument is essential both times; counsel's abandonment of his client during that critical stage of either phase constitutes a violation of *Cronic*.

As we plainly stated in *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir.1991), counsel's abandonment of his client during closing argument causes "a breakdown in our adversarial system of justice ... that compels an application of the *Cronic* exception to the *Strickland* [prejudice] requirement." If a defendant is effectively without the benefit of counsel during closing argument, a fundamental breakdown in the adversarial process has occurred and it simply does not matter what counsel may have done prior to that point or what effect or lack of effect the reviewing court thinks that a closing argument might have had on the outcome of the proceeding.

*Swanson*'s conclusion that an attorney's abandonment of his client during closing argument constitutes a fundamental error that in and of itself requires reversal is in keeping with the fact that the requirement of adversarial advocacy extends not only to counsel's presentation of exculpatory evidence, but also to his presentation of a closing argument. *Herring v. New York*, 422 U.S. 853, 858, 95 S.Ct. 2550, 2553–54, 45 L.Ed.2d 593 (1975). As the *Swanson* court concluded, there is a constitutional obligation on defense counsel "to function as the Government's adversary" at the time of that argument. *Swanson*, 943 F.2d at 1074.

In *Herring*, the Supreme Court made clear that the Sixth Amendment right to counsel encompasses the right to have defense counsel present a closing summation, thus recognizing the extraordinary significance of counsel's closing argument in the adversarial process. If a defendant has been denied the opportunity to make a closing argument, his criminal conviction cannot stand, regardless of whether such an argument would have succeeded in persuading the factfinder of the defendant's position. *Id.* "'The constitutional right of a defendant to be heard through counsel necessarily includes his right to have his counsel make a proper argument on the evidence and the applicable law in his favor, *however simple, clear, unimpeached,* and *conclusive* the evidence may seem.'" *Id.* at 860, 95 S.Ct. at 2554 (quoting *Yopps v. Maryland*, 228 Md. 204, 178 A.2d 879, 881 (1962)) (emphasis added).

The *Swanson* decision is likewise consistent with the heightened need for reliable proceedings in capital cases. Not every person who has been convicted of murder deserves to be executed. One of the principal purposes of a capital trial is to identify those who should be sentenced to death for their crimes, and those who should not. *See Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976) (plurality opinion). There is no more important hearing in law or equity than the penalty phase of a capital trial. In a process already plagued by arbitrariness, the right to counsel ensures that the results of penalty-phase proceedings are as reliable as possible. The determination of who should live and who should die is arrived at by means of an adversarial hearing in which the government's position that the defendant should be sentenced to death is put to the test by defense counsel. Closing argument is an essential part of that proceeding, a part at which vigorous advocacy is the sine qua non. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective.... In a criminal trial, which is in the end basically a factfinding process, no aspect of such advocacy could be more important than the opportunity finally

to marshal the evidence for each side before submission of the case to judgment." *Herring*, 422 U.S. at 862, 95 S.Ct. at 2555.

*Herring* makes clear that regardless of the fact that counsel presented evidence or made legal objections during a proceeding, the absence of a closing argument *in itself* requires reversal. The majority's attempt to rely on the presentation of witnesses or the advancement of legal objections is thus simply irrelevant. The flaw that renders Gerlaugh's sentencing unconstitutional is the failure of counsel to provide representation at a critical stage of the proceeding—closing *argument.* That failure alone requires reversal under *Cronic,*. regardless of what else may have transpired.

The adversarial process is simple, and it works when it has two sides. But when there is only one side to the argument, the truthfinding purpose of the trial breaks down and the results are presumptively unreliable.

### B.

The majority carries its inability to distinguish *Cronic* from *Strickland* error to its logical conclusion. It applies a harmless error test to counsel's performance. Not only is this harmless error analysis in conflict with *Cronic* and *Swanson,* but it is also at odds with the more basic proposition that certain kinds of error are so fundamental that we must presume prejudice. It is apparent that an attorney's abandonment of his client at a critical stage in the proceeding constitutes a structural error as defined in *Arizona v. Fulminante,* 499 · U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). Such an error not only alters the basic framework of a criminal trial, it also undermines values that are fundamental to our system of justice. *See United States v. Olano,* 62 F.3d 1180, 1207–10 (9th Cir.1995) (Reinhardt, J., dissenting) (elaborating on the nature of structural errors), *cert. denied,* —— U.S. ——, 117 S.Ct. 303, 136 L.Ed.2d 221 (1996). Thus, the majority has seriously erred in subjecting to harmless error analysis coun-

sel's abandonment of Gerlaugh at a critical stage of his capital trial.[5]

Closing argument is one of the most important stages in a criminal trial. It is the moment at which the parties tie all of the evidence together, illuminate the significance of the evidence to the factfinder, and argue why the evidence supports their respective positions. It is the time at which the parties emphasize certain facts and explain away others. It is an opportunity for the parties to remind the factfinder of things that might have been forgotten along the way. For a defendant in a capital trial, it is "the last clear chance to persuade the trier of fact" that he should not be executed. *Herring,* 422 U.S. at 862, 95 S.Ct. at 2555. And it is no less a part of a trial's basic framework if the evidence is presented in the context of a bench trial instead of a jury trial. *See id.* at 863 n. 15, 95 S.Ct. at 2556 n. 15 (flatly rejecting the contention that "there is insufficient justification" for the right to make a closing argument in bench trials, and suggesting that summations may be even more important if there is only one factfinder).

Additionally, final arguments further one of the most significant values in a criminal trial, the adversarial process itself. Without question, the adversarial process is the hallmark of our system of justice. An attorney's desertion of his client at a critical stage of the proceeding undermines the very premise of this process—that the issues and the evidence will be clarified and sharpened by vigorous presentations from both sides. When a defendant is abandoned at this moment, as Gerlaugh was, there has not been simply an error in the presentation of evidence: there has been an alteration in the very framework of the trial. When that alteration occurs in a capital trial, the unacceptable and unconstitutional consequences are at their most egregious.

\*　　\*　　\*

Because Gerlaugh was denied the benefit of counsel at a critical stage in his capital trial and because we are required to presume resulting prejudice, I do not reach the other

---

5. The majority makes this error because it mistakenly treats counsel's performance as *Strickland* rather than *Cronic* error. Wisely, my col-

leagues do not suggest that *Cronic* error may be subjected to a harmless error test.

sentencing issues. I simply dissent from the imposition of the death penalty on the ground that Gerlaugh lacked effective assistance of counsel at a critical stage of the proceeding.

In re NATIONAL ENVIRONMENTAL WASTE CORP., a California corporation, Debtor.