FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TEDDY BRIAN SANCHEZ,
*Petitioner-Appellant*,

v.

RONALD DAVIS, Warden, San
Quentin State Prison,
*Respondent-Appellee.*

No. 16-99005

D.C. No.
1:97-cv-06134-
AWI-SAB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, District Judge, Presiding

Argued and Submitted July 13, 2020
San Francisco, California

Filed April 22, 2021

Before: Ronald M. Gould, Consuelo M. Callahan, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Teddy Brian Sanchez's habeas corpus petition challenging his California state conviction and death sentence for two first-degree murders.

The panel applied the deferential standards imposed by the Antiterrorism and Effective Death Penalty Act in a case in which the district court granted Certificates of Appealability (COA) on three issues, and the panel granted a COA on uncertified claims pertaining to ineffective assistance of counsel.

Because there was no reasoned state court decision addressing any of Sanchez's claims, the panel considered what arguments could have supported the state court's decision, and then asked whether those arguments or theories are inconsistent with a prior Supreme Court holding.

Sanchez claimed that Eugene Toton, lead counsel at the guilt phase, was ineffective for failing to investigate and present evidence from a jailhouse informant. The panel wrote that although there are reasonable arguments for and against the contention that Toton's conduct constituted deficient performance, it did not need to decide that question because Sanchez did not establish prejudice, as the informant's testimony would not have created a reasonable

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

probability that Sanchez would not have been convicted as an aider and abettor in the murders.

As to Sanchez's claim that Toton and Gary Frank—who shared responsibilities at the penalty phase—provided ineffective assistance when they did not raise Sanchez's mental impairments as mitigating evidence at the penalty phase, the panel held that Toton and Frank did not render deficient performance.

The panel denied relief on Sanchez's claim that the trial court, in denying his automatic motion for a modification of the death sentence, failed to consider his mitigation evidence presented during the penalty phase as required by Cal. Pen. Code § 190.4(e). Sanchez asserted that the California Supreme Court's denial of this claim on the merits amounted to an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2), and that the trial court violated the Eighth and Fourteenth Amendments when it failed to consider the mitigating evidence. Without clearly established federal law to support the claim that the Constitution requires an independent judicial review of a jury's death verdict, the panel wrote that it could not issue a writ of habeas corpus based on perceived error of state law.

Sanchez contended that his death sentence is disproportionate to the sentences received by his co-defendants, that these disparate impositions of penalties violated the Eighth and Fourteenth Amendments, and that he is entitled to intra-case proportionality review. Affirming the district court's denial of habeas relief on Sanchez's proportionality claim, the panel explained that there is no clearly established federal law requiring intra-case proportionality review, and noted that the California

Supreme Court provided meaningful appellate review when it rejected Sanchez's proportionality claim.

In a simultaneously filed memorandum disposition, the panel affirmed the district court on all other previously uncertified claims relating to ineffective assistance of counsel.

**COUNSEL**

Nina Rivkind (argued), Berkeley, California; Heather E. Williams, Federal Defender; David Harshaw, Assistant Federal Defender; Office of the Federal Public Defender, Sacramento, California; for Petitioner-Appellant.

Jamie A. Scheidegger (argued), Sean M. McCoy, and Rachelle A. Newcomb, Deputy Attorneys General; Michael P. Farrell, Senior Assistant Attorney General; Lance Winters, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Respondent-Appellee.

**OPINION**

GOULD, Circuit Judge:

Teddy Sanchez appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Following a bench trial in 1988, a California court convicted Sanchez of the first-degree murders of Juan and Juanita Bocanegra and Woodrow Tatman. A jury sentenced Sanchez to death.

After exhausting his state court remedies, Sanchez filed a federal habeas petition seeking relief from his conviction and sentence. The district court denied relief, and granted Certificates of Appealability ("COA") on the following issues: (1) whether defense counsel provided ineffective assistance by failing to investigate and present testimony of jailhouse informant Charles Seeley; (2) whether the trial court failed to consider Sanchez's mitigation evidence when it imposed the death penalty; and (3) whether imposition of the death penalty is constitutionally disproportionate as to Sanchez. Sanchez timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253, and we affirm.

In his briefing, Sanchez also raises several uncertified issues. We grant a COA on the claims pertaining to ineffective assistance of counsel ("IAC"). *See Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) (holding that the district court erred in limiting a COA to particular ineffective assistance of counsel claims rather than to the broader issue of whether the petitioner demonstrated a denial of the constitutional right to effective assistance of counsel). In this opinion, we address the certified claims as well as the previously uncertified claim ("Claim 48"), namely whether

trial counsel failed to present evidence of Sanchez's mental impairments at the penalty phase.[1]

## I. BACKGROUND

### A. The Crimes[2]

### 1. The Tatman Murder

Woodrow Wilson Tatman was "a frail, undernourished, 72-year-old man who . . . was confined to a wheelchair." *People v. Sanchez*, 12 Cal. 4th 1, 19 (1995). Tatman rented a room at the Bakersfield Inn and spent his days drinking alcohol and watching television. *Id.* Motel employees helped care for Tatman and gave money to him from his Social Security checks. *Id.* Tatman was last seen alive on February 2, 1987. *Id.*

On the afternoon of February 4, 1987, an employee noticed that Tatman's curtains were drawn and that he had not yet picked up his check. *Id.* The employee discovered Tatman's body on the floor near his bed, covered with a bedspread. *Id.* Tatman's television, radio, and electric skillet were missing from the room. *Id.* An autopsy report indicated that Tatman was killed by a massive blunt force injury to the left chest, collapsing his left lung and causing

---

[1] In a separate memorandum disposition filed simultaneously with this opinion, we affirm the district court on all other previously uncertified claims relating to ineffective assistance of counsel raised by Teddy Sanchez.

[2] Our recitation of the facts is based on the California Supreme Court opinion upholding Sanchez's conviction and sentence on direct appeal, *see People v. Sanchez*, 12 Cal. 4th 1 (1995), and on our own review of the record.

substantial hemorrhaging, consistent with a heel stomp or an instrument approximately two inches by three inches in size. *Id.* Tatman also had several superficial stab wounds to the chest and lower abdomen which did not contribute to his death. *Id.*

According to evidence presented at trial, Sanchez, Robert Reyes, and an unknown third person planned to rob Tatman for his check, his refrigerator, and other items in his room. *Id.* at 21. Detective Randy Boggs testified that Sanchez told him that Tatman was asleep when they entered his room. *Id.* Sanchez was taking items from the room when Tatman woke up. *Id.* Reyes pulled Tatman from the bed and stabbed him with a screwdriver. *Id.* Despite blaming Reyes for the murder, Sanchez's statement explained only the superficial stab wounds, not the delivery of the fatal blow. *Id.*

## 2. The Bocanegra Murders

On February 3, 1987, the day after Tatman's murder, Juan and Juanita Bocanegra were murdered in their home. *Id.* at 17. Juanita[3] was found in her sewing room with lengths of fabric tied around her neck and right wrist, and Juan was found in the kitchen. *Id.* Both had extensive stab wounds and head injuries. *Id.* at 17. Blood spatter evidence showed that the attack began in a hallway near the bathroom before moving to the kitchen where large amounts of blood showed that a struggle took place throughout the room. *Id.* at 18. There were small amounts of diluted blood in the

---

[3] For clarity, we refer to the members of the Bocanegra family by their first names.

bathroom, suggesting that someone had cleaned up after the attack. *Id.*

Police found evidence of two types of shoe tracks on the floor of the Bocanegra kitchen and one consistent shoe track in the bathroom. *Id.* Police also found a bloody palm print belonging to Reyes on the doorknob inside the Bocanegra front door. *Id.* Autopsies performed on both Juan and Juanita revealed that they died from massive hemorrhaging caused by multiple stab wounds. *Id.* The day after the murder, police found the Bocanegras' car abandoned. *Id.* Based on bloodstains and fingerprints in the car, police arrested the Bocanegras' son, Joey Bocanegra. *Id.*

Detective Bob Stratton interviewed Sanchez multiple times. *Sanchez*, 12 Cal. 4th at 20. Initially, Sanchez told Stratton that he saw Joey leaving the Bocanegras' house on the day of their murders. *Id.* Later, after Stratton challenged Sanchez's initial story, Sanchez asked several hypothetical questions, including, "What if I was present in the house; what if Joey hit his dad after his dad had refused to give some money; and what if Joey's dad hit him back and what if Joey got real mad and grabbed a knife and started stabbing his dad; what if Joey's mother didn't know what was happening because she was in another room?" *Id.*

Two pieces of physical evidence further linked Sanchez to the crime. *Id.* at 18. The Bocanegras' television set was found in the same room at the Bakersfield Inn where Sanchez stayed at the time of the murder, and Sanchez sold the Bocanegras' vacuum cleaner to one of the motel employees. *Id.* The remaining evidence against Sanchez was primarily circumstantial, along with Sanchez's incriminating statements to Detectives Boggs and Stratton, a jailhouse informant named Rufus Hernandez, and a local reporter named Michael Trihey. *Id.* at 18–21.

Sanchez, Reyes, and Joey were charged with robbery and first-degree murder of the Bocanegras, with allegations of robbery-murder and multiple-murder special circumstances. Sanchez and Reyes were also charged with robbery and first-degree murder of Tatman with an allegation of the robbery-murder special circumstance. On the prosecution's motion, the trial court dismissed the charges against Joey. Reyes ultimately pleaded guilty to three counts of first-degree murder in exchange for three consecutive sentences of life with the possibility of parole.

### B. Trial: Guilt Phase

Sanchez was represented by attorneys Eugene Toton and Gary Frank. Toton was lead counsel at the guilt phase, and Toton and Frank shared responsibilities at the penalty phase. Before trial, the court appointed psychiatrist Francis Matychowiak to determine whether Sanchez was mentally competent. Dr. Matychowiak diagnosed Sanchez with borderline personality disorder and no other significant mental impairments, concluding that Sanchez was competent to stand trial. Toton also retained psychologist Theodore Donaldson, Ph.D. to assess Sanchez's competence, a possible insanity defense, and whether Sanchez was developmentally disabled. Dr. Donaldson found no reality deficits, thought disorders, significant anxiety, or depression, and he concluded that Sanchez was "a highly sociopathic individual." Neither Dr. Matychowiak nor Dr. Donaldson recommended any additional testing. Toton did not pursue any further testing or psychological evaluation, and he did not present a mental state defense at trial.

Sanchez waived his right to a jury trial at the guilt and special circumstance phases and submitted the guilt phase for a bench trial based on the preliminary hearing transcripts,

with some additional witness testimony and other evidentiary submissions. Detectives Stratton and Boggs testified about Sanchez's incriminating statements made in their interviews with him during their investigation of the murders. *See supra* Part I.A.

The court also heard testimony from jailhouse informant Hernandez. Hernandez was incarcerated with Sanchez for two months in early 1987, and he reportedly spoke to Sanchez about the Bocanegra murders. *Sanchez*, 12 Cal. 4th at 19–20. Hernandez had been charged with receiving stolen property and second-degree burglary. *Id.* In exchange for his testimony against Sanchez, Hernandez received six months in county jail and three years of probation. *Id.*

Hernandez testified that Sanchez told him that he went to the Bocanegras' house with Joey. *Id.* Hernandez's testimony was inconsistent as to whether Sanchez and Joey planned to rob the Bocanegras or planned to borrow money. *Id.* According to Hernandez, Sanchez said that he waited outside and entered the house when he heard Joey and Juan arguing in the hallway. *Id.* Sanchez tried to stop the fight by hitting Juan with a curved metal bar, and Sanchez did not say whether Joey stabbed Juan before or after Sanchez hit Juan. *Id.*

Juanita heard the confrontation and came out of a back room yelling. *Id.* Sanchez slipped in a puddle of blood as he jumped over Juan to grab Juanita, and Sanchez told Joey to "shut her up." *Id.* Joey then stabbed his mother repeatedly and pushed her into the sewing room. *Id.* Sanchez did not tell Hernandez that he participated beyond restraining Juanita, but Sanchez claimed that he saw Joey stab both victims with a kitchen knife. *Id.* Sanchez threw the metal bar into the front yard, one of the assailants threw the knife into a canal, and Joey took the television, a toolbox, and his

parents' car.  *Id.*   Hernandez then reported Sanchez's statements to Detective Stratton.  *Id.*

A second jailhouse informant named Charles Seeley claimed to have had several conversations with Sanchez about the murders.  Seeley spoke to an investigator from the district attorney's office, and his statements were available to Sanchez's counsel before trial.  Toton did not investigate Seeley's statements, and neither party offered Seeley's testimony in the guilt or penalty phase.

Against his attorneys' advice, Sanchez repeatedly spoke to Michael Trihey, a reporter for the *Bakersfield Californian* newspaper.  Trihey reported that Sanchez described himself as a triple murderer, said death was an appropriate punishment, and said that he wanted to die for what he had done.  *Id.* at 21, 36.

The trial court found Sanchez guilty of the first-degree murders of Tatman and the Bocanegras.  The court found true the multiple-murder special circumstance allegation as to the Bocanegra murders but found not true the robbery-murder special circumstance allegations that had been charged in the Tatman and Bocanegra murders.  The court also found that Sanchez used a deadly and dangerous weapon in both Bocanegra murders, and that Sanchez was guilty of the robbery of Tatman but not guilty of the robbery of the Bocanegras.

## C. Trial: Penalty Phase

The court empaneled a penalty phase jury and heard more evidence and arguments.  The prosecution introduced aggravating evidence, including evidence of Sanchez's past crimes, as well as further testimony from Detective Boggs, Detective Stratton, and Hernandez.

The jury heard evidence of Sanchez's criminal history, including that in May 1982, Sanchez had assaulted a store owner who was hospitalized for two weeks as a result. In June 1982, Sanchez attacked an acquaintance who refused to comply with Sanchez's demand for money.

Boggs testified that Sanchez told him that after stealing Tatman's possessions, he and Reyes "kicked back, drank some whiskey, smoked some dope, ate some food and just relaxed for the rest of the evening." Stratton and Hernandez testified that Sanchez told Hernandez that he had taken an active role in the murders, including beating the Bocanegras and beating and assisting Reyes in stabbing Tatman. With respect to the Bocanegra murders, Hernandez testified that Sanchez entered the Bocanegra home with a metal bar, ran up to Juan, held Juan in place until Joey got a knife, and then both Sanchez and Joey beat and stabbed Juan. When Juanita walked out of the sewing room, Sanchez "rushed [her]," and both Sanchez and Joey stabbed her and beat her with the metal bar.

As mitigating evidence, Sanchez presented testimony from relatives, friends, and social anthropologist Isabel Wright, Ph.D., to the effect that his "dysfunctional[,] poverty-stricken, migratory family life severely hampered his ability to live a productive life." Sanchez was rejected by his mother after his birth and sent to live with his grandparents. At the age of three, Sanchez's parents moved him from his grandparents' home to Arkansas. Soon thereafter, Sanchez's mother left his stepfather and moved Sanchez and his half-brother to California. Further disrupting Sanchez's home life, his mother remarried a man with three children, and the couple subsequently had five additional children.

Sanchez's mother and stepfather were alcoholics and drug abusers who were violent with each other and their children. Sanchez's grandparents also drank heavily and abused drugs. Sanchez's mother and stepfather died in their mid-thirties of acute alcoholism. Sanchez tried to take care of his siblings but turned to drugs to escape his difficult life. He began committing crimes because he had "no marketable job skills to prepare him for life as an adult." Toton and Frank did not introduce evidence of any mental impairments.

After hearing and weighing the aggravating and mitigating evidence, the jury sentenced Sanchez to death.

### D. Post-Conviction Proceedings

The California Supreme Court affirmed Sanchez's convictions and sentences on direct appeal. *Sanchez*, 12 Cal. 4th 1, *cert. denied*, 519 U.S. 835 (1996). The California Supreme Court then denied Sanchez's initial habeas petition in a summary denial order.[4]

On September 17, 1998, Sanchez timely filed a federal habeas petition in the United States District Court for the Eastern District of California. The district court denied that petition on the merits on July 22, 2015. The district court

---

[4] In 2017, Sanchez filed a second state habeas petition in the California Supreme Court alleging claims under *People v. Chiu*, 59 Cal. 4th 155, 166 (2014) (an aider and abettor may not be convicted of first-degree premeditated murder in California under the natural and probable consequences doctrine). On May 22, 2019, the California Supreme Court transferred Sanchez's petition to Kern County Superior Court. The state proceeding remains pending as of the publication of this opinion.

denied a motion for reconsideration, and Sanchez timely appealed.

## II. STANDARD OF REVIEW

We review a district court's denial of a petition for a writ of habeas corpus and its findings of fact *de novo*. *See Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010). Because Sanchez's petition was filed after the Antiterrorism and Effective Death Penalty Act ("AEDPA") became effective, we may grant relief only if the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under § 2254(d)(1), "clearly established" "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's decision is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner]'s case." *Id*.

Even a strong case for relief does not mean the state court's denial was unreasonable. *Harrington v. Richter*,

562 U.S. 86, 102 (2011).  The standard is highly deferential and demands that state court decisions be given the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). To obtain relief on a claim in federal court, a petitioner bears the burden to demonstrate that the state court's ruling on the claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.  *Richter*, 562 U.S. at 102–03.

We apply the deferential review under AEDPA to the last reasoned state court decision.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  In this case, because there is no reasoned state court decision addressing any of the claims, we consider what arguments could have supported the state court's decision, and then ask whether it is possible fair-minded jurists could disagree about whether those arguments or theories are inconsistent with a prior Supreme Court holding.  *Richter*, 562 U.S. at 102.

## III. DISCUSSION

### A. Ineffective Assistance of Counsel

Sanchez raises two ineffective assistance of counsel claims.[5]  In the first claim, initially certified by the district court, Sanchez contends that Toton rendered ineffective assistance at the guilt phase by failing to investigate and present evidence from jailhouse informant Charles Seeley. In the second claim, on which we grant a COA, Sanchez contends that Toton and Frank rendered ineffective

---

[5] We address Sanchez's additional IAC challenges in the separate memorandum disposition filed simultaneously with this opinion.

assistance at the penalty phase for failing to raise Sanchez's mental impairments as mitigating evidence.[6]

To establish that counsel's legal representation fell below the standard required by the Sixth Amendment, Sanchez must show that counsel's performance was both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Smith v. Robbins*, 528 U.S. 259, 285–89 (2000). The "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To establish deficient performance, Sanchez must show that counsel's performance fell below an objective standard of reasonableness. *Id*. at 688. Under *Strickland*, we apply a strong presumption that counsel's performance was within the wide range of reasonable professional assistance. *Id*. at

---

[6] Toton was disbarred four months after Sanchez was sentenced to death. Sanchez asserts that Toton was subject to disbarment proceedings during the time of the trial due to allegations of failing to perform services and misappropriation of client funds and deceptive dealings in unrelated cases. Although Sanchez acknowledges that Toton was still a licensed attorney while representing Sanchez, he asserts that Toton had already agreed to surrender his law license and did not disclose this fact to his co-counsel or the trial court. Sanchez also acknowledges, however, that Toton's later disbarment does not prove his ineffectiveness in this case, although it may raise doubts about his competence. *See Sanders v. Ratelle*, 21 F.3d 1446, 1460 (9th Cir. 1994) (holding that a subsequent disbarment could help to explain a failure to investigate). We limit discussion of Toton's subsequent disbarment to this footnote. *See Bonin v. Calderon*, 59 F.3d 815, 828–29 (9th Cir. 1995) ("[A] habeas petitioner should not be allowed to transform what should be an inquiry into the reasonableness of counsel's performance . . . into a[] general inquisition of defense counsel's record and reputation.").

689. Moreover, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. Both the *Strickland* standard and the standard under § 2254(d) are highly deferential and when the two apply together, our review is doubly deferential. *Id*. Under AEDPA, we ask not whether counsel's actions were reasonable; rather, we ask whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard. *Id*. "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id*. (internal citation omitted). Thus, we are required not merely to give trial counsel the benefit of the doubt, "but to affirmatively entertain the range of possible reasons" for counsel having proceeded as they did. *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (internal quotation omitted).

The prejudice prong of the *Strickland* analysis is equally burdensome. Sanchez must show that it is "reasonably likely" that the result would have been different. *Richter*, 562 U.S. at 111 (citing *Strickland*, 466 U.S. at 696). The likelihood of a different result must be substantial, not just conceivable. *Id*. at 112. Assessing whether such a reasonable probability of a different trial outcome would have existed but for counsel's deficient performance requires assessing the hypothetical impact of evidence not presented at trial on that which was presented. *Strickland*, 466 U.S. at 696 ("Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."). Our analysis "must consider the totality of the evidence before the judge or jury," keeping

in mind that the weaker the evidence at trial, the more likely it was that an attorney's error was prejudicial.  *Id.* at 695–96.

### 1. Claim 8:  Evidence from Charles Seeley

Sanchez contends that Toton was ineffective for failing to investigate and present evidence from jailhouse informant Seeley.  On July 27, 1987, an investigator from the Kern County District Attorney's Office interviewed Seeley at the California Institution for Men at Chino.  Seeley said that he had been housed two cells away from Sanchez in the Kern County Jail for months before Sanchez's trial and claimed to have had several conversations with Sanchez, including discussions of Sanchez's criminal activity.

Seeley said that Sanchez told him about the Bocanegra murders.  Seeley's account differs from Hernandez's testimony.  According to Seeley, Sanchez said that he and Reyes met with Joey on the day of the murder and went to the Bocanegra home so that Joey could ask his father for money to buy drugs.  Sanchez and Reyes sat in the living room watching television while Joey spoke with his father.  Sanchez heard a scuffle in the kitchen, and he and Reyes went to investigate.  Sanchez saw Joey stabbing Juan repeatedly and hitting Juan over the head with a curved, metal bar.

Under Seeley's account, Juanita came down the hall, screaming for the men to stop.  Sanchez and Reyes grabbed Juanita and pushed her back down the hall into a bedroom.  Sanchez tried to tie Juanita's hands and feet with some nearby fabric.  When she would not stop screaming, Sanchez tied a length of cloth around her face or neck.  According to Seeley, Sanchez did not clarify whether he was trying to gag or strangle her.  While Sanchez tried to restrain Juanita, Reyes unsuccessfully attempted to hit her with the metal bar.

Seeing Reyes struggling, Sanchez took the bar and used it to strike her on the head several times. Joey then came into the room, told his mother to shut up, and repeatedly stabbed her when she continued to scream.

After Sanchez, Reyes, and Joey completed their attack on Joey's parents, the three men cleaned up in the bathroom and changed clothes. Sanchez then went outside to check for potential witnesses and helped carry several items from the house, including money from Joey's parents. Sanchez recalled that the three men were laughing about the murders as they left the house, dumped the bloody clothes in a canal, and took the stolen items to a drug connection's house.

Regarding the Tatman murder, Seeley said that Sanchez told him the following information: On the day before the Bocanegra murders, Sanchez accompanied Reyes and an unidentified third man to Tatman's room at the Bakersfield Inn while Tatman slept, planning to steal his television and Social Security check. Tatman woke up while Sanchez was carrying items out of the room, Reyes hit Tatman with a metal bar, and one of the men stabbed Tatman. Sanchez covered up Tatman's body, helped clean up the room, and carried out the stolen property.

Seeley also claimed in the interview that he spoke with Reyes while they were incarcerated together. Reyes reportedly laughed about the murders, recounting that he and Sanchez had gone to the Bocanegra house to get money from Joey's father because they knew that Juan had just received a disability check. Reyes allegedly said that he was in the living room when he heard Joey arguing with his father. When Reyes went to investigate, he saw Joey stabbing Juan. Reyes reportedly said that he removed a metal bar from his waistband and began to hit Juan in the head as Joey continued stabbing, even after Juan slumped to the floor.

According to Seeley, Reyes recounted that while he and Joey assaulted Juan, Sanchez struggled to restrain Juanita in the hallway and called for help pushing her to the back bedroom. Reyes allegedly said that he hit Juanita with the metal bar while Sanchez tried to gag or strangle her with a length of fabric. Joey then came to the bedroom, told his mother to shut up, and began to stab her. After the three men cleaned up, Reyes reportedly said that they removed items from the house, loaded them into Juanita's car, and Reyes and Joey changed into some of Juan's clothes. According to this account, there was so much stolen property in the car that Reyes could barely fit in the back seat. Reyes also allegedly said that all three men had been smoking PCP all day and left the scene to buy more drugs and get high.

Although Seeley's statements were made to an investigator from the district attorney's office and available to Sanchez's counsel before trial, neither party offered Seeley's testimony in the guilt or penalty phase.

In his state habeas petition, Sanchez claimed that Toton was ineffective for not interviewing Seeley and not calling him as a defense witness. The California Supreme Court rejected this claim in a summary denial. In support of his state and federal habeas petitions, Sanchez submitted a transcript of Seeley's statement; declarations from Sanchez's trial attorneys Toton and Frank, defense investigator Susan Penninger, medical expert David Foster, M.D., and habeas attorney Steven Shatz; and declarations from Reyes's counsel Stanley Simrin and Daniel Ybarra.

The district court denied the claim on the merits, concluding that Toton could have had tactical reasons for not interviewing Seeley and that the state court could have reasonably concluded that there was not a reasonable

probability of a different outcome had the proposed testimony been presented.

On appeal, Sanchez emphasizes that Reyes's admissions to Seeley identified Reyes—not Sanchez—as the second assailant responsible for Juan's murder. This discrepancy, according to Sanchez, directly contradicted the prosecution's theory that Sanchez aided and abetted Juan's murder. Sanchez further contends that Seeley's testimony would have pointed to Joey—not Sanchez—as the one who told Juanita to shut up, undermining the prosecution's theory that Sanchez had aided and abetted the first-degree murder of Juanita.

A strong argument can be made that, by failing to investigate and present Reyes's admissions to Seeley—which refuted the only trial testimony that directly implicated Sanchez in Juan's murder—Toton's performance was deficient. Although Toton had no obligation to pursue an investigation that would have been harmful to Sanchez, Hernandez's testimony already provided evidence for concluding that Sanchez beat Juanita with the metal bar. Thus, if Seeley were cross-examined on what Sanchez told him, which was that Sanchez hit Juanita on the head with the bar several times, that portion of Seeley's testimony might be merely duplicative and would not add to the totality of evidence against Sanchez. *See Browning v. Baker*, 875 F.3d 444, 473 (9th Cir. 2017) (recognizing that "the obligation to investigate, recognized by *Strickland*, exists when there is no reason to believe doing so would be fruitless or harmful"). Moreover, Toton's inactions can be said to show that Toton, despite possessing Seeley's recorded interview that detailed Reyes's confession, did not understand Seeley's potential value as a defense witness. *See Staten v. Davis*, 962 F.3d 487, 495 (9th Cir. 2020) (finding objectively unreasonable

performance where "[t]he record thus suggests not that [defense counsel] thoroughly probed the issue and determined that the witnesses' stories were not credible, but rather that he did not recognize the possible significance of the incident and failed to investigate it fully").

Similarly, a strong argument can be made that, under the doubly deferential standard of AEDPA and *Strickland*, a reasonable jurist could determine that the failure to introduce evidence of questionable benefit and possible harm to the defense did not amount to deficient performance. *See Richter*, 562 U.S. at 105, 108.[7] Seeley's account may have been more damaging to Sanchez than Hernandez's account because Seeley's account may have described Sanchez actively participating in Juan's murder by preventing Juanita from intervening or calling for help as the attack took place, and Seeley's version may have suggested a higher level of culpability for Sanchez in murdering Juanita than was apparent from Hernandez's account. *See Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997) (failure to call three witnesses who could have relayed mitigating sentencing evidence was a reasonable tactical decision because counsel reasonably believed the testimony could backfire). Toton's prior experience with Seeley, coupled with his correct assessment that the State would not call Seeley as a witness, indicates that Toton may have

---

[7] Sanchez presents a different claim than the one he asserted before the California Supreme Court and the district court. On appeal, Sanchez contends that Toton should have attempted to present only those portions of Seeley's statements that allegedly came from Reyes. Before the state and district courts, however, Sanchez contended that Toton and Frank rendered ineffective assistance for failing to introduce both his and Reyes's alleged statements to Seeley. Because we review the claims as presented to the state court, we consider the claim in its totality. *See Pinholster*, 563 U.S. at 181–82.

reasonably determined that Seeley's statements were not credible.

Though there are reasonable arguments for and against deficient performance, we do not decide whether Toton's conduct constituted deficient performance because we conclude that Sanchez did not establish prejudice under *Strickland*'s second prong.

The physical evidence presented at Sanchez's trial was not overwhelming; it established that at least two assailants were responsible for the Bocanegra murders but did not provide many clues as to who the assailants were. Juan and Juanita were discovered murdered in their home having sustained stab wounds and head injuries. Blood spatter "indicated a fierce struggle occurred throughout the house," and two sets of shoeprints were identified in the blood.[8] *Sanchez*, 12 Cal. 4th at 18. From this, the State's theory—at least at Sanchez's trial—was that two assailants, Sanchez and Joey Bocanegra, attacked and killed Juan and Juanita Bocanegra. The physical evidence that tied Sanchez to the murders was that he was later discovered in possession of a television that he had taken from the Bocanegras' residence; Sanchez also sold the Bocanegras' vacuum cleaner to another individual. Other physical evidence connected Reyes and Joey Bocanegra to the murders. This included Reyes's bloody palm print, which was found on the front doorknob inside the Bocanegra residence, and Joey's fingerprints, which were found in the Bocanegras' blood-soaked car the day after the murders.

---

[8] The State's expert later revised his report during the state's case against Reyes for the same murders and concluded there were three sets of shoeprints in the kitchen.

Beyond the physical evidence, Sanchez made incriminating statements to three parties about the Bocanegra murders which were admitted in evidence against him. The most important of these witnesses was Sanchez's cellmate at the county jail, Rufus Hernandez. Hernandez provided the only evidence that Sanchez attacked Juan Bocanegra. Other evidence—physical and testimonial—tended to show that Sanchez was at the Bocanegra home when Juan and Juanita were murdered. Hernandez testified that Sanchez told him that he had gone to the Bocanegra residence with Joey the morning of the murders, and at some point, heard Joey arguing with Juan in the house while he waited outside. Sanchez entered the house and attempted to break up the fight between the father and son, and then Sanchez began hitting Juan with a curved metal bar, and Joey stabbed and killed Juan. Juanita came into the room screaming, and Sanchez yelled at Joey to "shut her up." Sanchez then grabbed Juanita while Joey stabbed her, and the two of them pushed her into the back bedroom where she was killed. Joey and Sanchez then took a few items from the home and left. Thus, regardless of whether Reyes told Seeley that Reyes wielded the metal bar hitting Juan, and Hernandez was incorrect as to that, the fact remains that Hernandez put Sanchez in the middle of the Joey-Juan fight; he was not "down the hall" in the living room watching TV. Hernandez's testimony also provides evidence that Sanchez aided and abetted Juan's murder when he restrained Juanita and told Joey to "shut her up," because the only reasonable inference is that he was trying to prevent her from interfering in Juan's murder. This is because the object was to ensure Joey got the money for drugs from Juan one way or another.

A second witness who testified about Sanchez's incriminating statements was police investigator Bob Stratton. Stratton testified that he spoke to Sanchez on two

occasions.  In their first conversation, Sanchez told Stratton that he had seen Joey on the morning Juan and Juanita were killed, but Sanchez denied having gone to the Bocanegra residence with Joey.  One week later, however, Sanchez again talked to Stratton.  This time Sanchez "asked Stratton a series of hypothetical questions, including: 'What if I was present in the house; what if Joey hit his dad after his dad had refused to give him some money; and what if Joey's dad hit him back and what if Joey got real mad and grabbed a knife and started stabbing his dad; what if Joey's mother didn't know what was happening because she was in another room?'"  *Sanchez*, 12 Cal. 4th at 20.  While Sanchez's questions to Stratton stopped short of confessing to the murders, they still placed Sanchez as a witness to the murder of Juan.  Moreover, they were false as to Juanita not knowing what was happening, because Sanchez had to restrain her when she came to the aid of Juan.

Finally, Michael Trihey, a reporter with the *Bakersfield Californian*, testified briefly regarding interviews he conducted with Sanchez after he was arrested.  Citing reporter's privilege, Trihey provided very limited testimony.  In the short, substantive portion of his testimony, Trihey stated that Sanchez had said in an interview that he was "a triple murderer" and that his victims "were killed for their social security checks."[9]  Thus, even if Sanchez might have incorrectly confessed to having been the actual "murderer" of Juan, Juanita, and Tatman, this statement shows that he

---

[9] A fourth witness, Detective Randy Boggs, testified about the Tatman murder only.  Boggs testified that Sanchez admitted he had gone with Reyes to rob Tatman the day before the Bocanegra murders. Sanchez told Boggs that while he was removing a refrigerator from Tatman's room, he witnessed Reyes kill the disabled Tatman by hitting him in the chest, throwing him to the floor, and stabbing him with a screwdriver.  *Sanchez*, 12 Cal. 4th at 21.

thought himself responsible for their murders, which is evidence of aiding and abetting.

From the trial evidence and testimony, the judge found Sanchez guilty of the first-degree murders of Juan and Juanita Bocanegra on the theory that he aided and abetted Joey's premeditated killings of his parents. The State argued at trial, and the California Supreme Court affirmed on direct appeal, that Hernandez's testimony allowed the court to conclude that Sanchez had beaten both Bocanegras with a metal bar while they were stabbed to death and that the act of beating both victims with the metal bar supported a finding that Sanchez knowingly aided in the murders and that he intended for both victims to be killed. *Sanchez*, 12 Cal. 4th at 34–35. Sanchez was also found guilty of the separate first-degree murder of Woodrow Wilson Tatman on a felony murder theory whereby Sanchez aided and abetted Reyes in the robbery of Tatman, and during the robbery Reyes killed Tatman. *Sanchez*, 12 Cal. 4th at 68.

Regarding special circumstances that potentially made Sanchez eligible for capital punishment, the court found the robbery murder special circumstance allegation not true for both the Tatman and Bocanegra murders. For the Bocanegra murders, the court found that any intent to rob the victims was not formed until after victims were killed, making the robbery murder special circumstance inapplicable. The trial court found the robbery murder special circumstance not true for the Tatman murder because Sanchez was "not the actual killer" and did not have an "intent to kill" Tatman. *Id.* at 67–68. The court found the multiple murder special circumstance allegation true for the Bocanegra murders only. *Id.* at 17. The upshot of all of this is that Sanchez's eligibility for a capital sentence was based on a finding that he aided in the murders of both Juan and Juanita Bocanegra

and that he harbored an intent to kill both victims.  *See id.* at 17, 31–32 & n.1.[10]

As discussed, had Seeley testified, the court would have heard an account of the Bocanegra murders that, while in some respects irreconcilable with the account given by Hernandez, still provided evidence that Sanchez aided and abetted the deaths of the Bocanegras and intended to kill both of them.  The State's theory at trial, and also when arguing the sufficiency of the evidence on direct appeal, was that Sanchez was liable as an aider and abettor of Juan's murder because Sanchez assaulted Juan with the metal bar while he was being stabbed by Joey, per Hernandez's testimony.[11]  Under Seeley's accounts from Reyes and Sanchez, Sanchez still aided and abetted Juan's murder by restraining Juanita from interfering.[12]  Accordingly, regardless of whose testimony the court would have found more credible—Hernandez's or Seeley's—there is no reasonable probability of a different trial outcome.  This is reinforced by Stratton's testimony, which placed Sanchez as a witness to the murder of Juan and showed that Sanchez was

---

[10] Sanchez's intent may be inferred from his actions where direct evidence is lacking, and "an act which has the effect of giving aid and encouragement, and which is done with knowledge of the criminal purpose of the person aided, may indicate that the actor intended to assist in fulfillment of the known criminal purpose."  *People v. Beeman*, 35 Cal. 3d 547, 559 (1984).

[11] In the State's closing argument, the assistant district attorney mentioned at least seven times that Sanchez struck Juan Bocanegra in the head with the metal bar as he was being stabbed, and from that act the court should infer that Sanchez intended to kill Juan or aid Joey in killing Juan.

[12] This is the alternative argument that the State put forth at oral argument.

not telling the true story about Juanita coming to Juan's aid, which Sanchez prevented by grabbing her.  Sanchez's admission to Trihey that he was a "triple murderer" is further evidence of aiding and abetting.

We hold that presenting Seeley's testimony would not have created a reasonable probability that Sanchez would not have been convicted as an aider and abettor in Juan and Juanita's murders.

### 2. Claim 48:  Mental Impairment Evidence

Sanchez contends that Toton and Frank provided ineffective assistance when they did not raise Sanchez's mental impairments as mitigating evidence at the penalty phase.  We conclude that Toton and Frank's performance was not deficient on this claim.

The California Supreme Court summarily denied this claim in Sanchez's state habeas petition.  The district court denied this claim on the merits, holding that it was not reasonably probable that Sanchez would have received a more favorable sentence had further mitigating evidence been presented.  The district court also specifically held that the state court could have reasonably found that Sanchez's alleged neurological and psychiatric conditions were not sufficiently supported by the record.

### i. The Mental Impairment Evidence

In support of this claim, Sanchez submitted a report from psychiatrist Francis Matychowiak, and declarations from psychologist      Theodore      Donaldson,      Ph.D.,

neuropsychologist Karen Froming, Ph.D., and psychiatrist David Foster, M.D.[13]

---

[13] Sanchez also submitted an unsigned declaration of Dr. Wright concerning her recollections of the penalty phase. Post-conviction counsel Nina Rivkind submitted these draft versions with her own signed declaration attesting that she was in the process of revising and finalizing a declaration for Wright's signature when Wright fell ill and passed away. The first version of Wright's declaration is a draft on which, according to Rivkind's declaration, Wright wrote handwritten changes and edits. Rivkind attested that she made these edits and others after speaking with Wright on the phone, that she submitted a revised draft for Wright's consideration, and that she learned of Wright's death soon thereafter.

The revised draft declaration purported to reflect Wright's recollections that Frank began work on the penalty phase late, that he was uncommunicative with Sanchez engendering mistrust, and that the penalty efforts were unfocused and mismanaged. The unsigned declaration also described Wright's purported efforts to convince Frank to engage experts in the effects of PCP use and a conversation wherein Wright recommended the use of a neuropsychologist to determine whether Sanchez had evidence of organic brain damage as a result of drug abuse. According to the unsigned declaration, a lack of time was the greatest impediment to performing additional work on Sanchez's history and mental health. Although the declaration purports to describe Wright's efforts to convince Frank to pursue evidence of a possible mental disorder, it also contains admissions that Wright was not a psychologist and not qualified to make a mental assessment.

Because the California Supreme Court summarily denied Sanchez's habeas petition, we do not know whether it considered Wright's unsigned declaration. As discussed *infra*, it was reasonable for the state court to deny Claim 48 concerning evidence of Sanchez's mental impairments. If the court declined to consider the Wright declaration, its denial was reasonable because the record contained no other expert suggestion that additional testing was needed. Moreover, Rivkind's signed declaration indicates that both versions of the unsigned declaration were drafts and works in progress, and Rivkind did not aver

The trial court appointed Dr. Matychowiak to determine if Sanchez was competent to stand trial. Dr. Matychowiak reported that Sanchez did not feel that he had killed anyone but was depressed and wanted to plead guilty to "get it over with." Dr. Matychowiak recorded Sanchez's difficult childhood, which included being raised initially by his grandmother and then taken back by his mother, who was addicted to drugs and would lock him in the closet. Sanchez also said that he began sniffing paint around the fifth grade, suffered a head injury in a fight when he was about 16 to 18 years old, and that his substance abuse since that time included alcohol and PCP. Sanchez reported no significant history of psychiatric hospitalizations or outpatient treatment, and denied any suicidal thoughts, delusions, or hallucinations at the time of the interview.

Dr. Matychowiak opined that Sanchez understood the court process and system, demonstrated no signs of bizarre mental processes, and had no discernable memory gaps. Sanchez also appeared to have borderline intelligence with no insight and poor general judgment. Dr. Matychowiak diagnosed Sanchez with a Borderline Personality Disorder and no other significant mental impairment, although he noted a recent history of depression evidenced by an apparent suicide attempt. Dr. Matychowiak concluded that Sanchez's diagnostic presentation did not significantly interfere with his ability to make and explain his decisions (including the decision to plead guilty and to accept the death

---

that Wright agreed with or agreed to sign the declaration after the first round of edits. If the court considered the Wright declaration, its denial was also reasonable because Wright's declaration is contradicted by other, signed declarations and because of her admission that she was not qualified to make a mental assessment. We limit our consideration of the Wright declaration to this footnote.

penalty), to understand court procedures and his need to present a defense, or to cooperate with his attorneys.

Before the preliminary hearing, Toton retained Dr. Donaldson to assess Sanchez's competence to stand trial, a possible insanity defense, and whether Sanchez was developmentally disabled. Dr. Donaldson detailed his findings in a declaration dated seven years after Sanchez's trial. Dr. Donaldson reported that Sanchez was of below average IQ (except for signs of average intelligence in abstract reasoning), that Sanchez had possible organic difficulties in perceptual motor integration (likely related to a history of paint sniffing and substance abuse), and that Sanchez had serious memory deficits. Nonetheless, Dr. Donaldson believed Sanchez to be of average intelligence, and he opined that testing showed no reality deficits, thought disorders, significant anxiety, or depression. Dr. Donaldson further observed that Sanchez displayed a "rather grandiose view of himself," and opined that Sanchez was "a highly sociopathic individual."

Almost two months after submitting his first declaration, Dr. Donaldson submitted a second declaration, which was also included with Sanchez's state habeas petition. Dr. Donaldson said that he evaluated Sanchez only for an insanity defense and did not consider the possibility of other mental state defenses. He said that at the time he interviewed and tested Sanchez, he discovered indications of a possible organic brain disfunction, which might have helped in Sanchez's defense.

Dr. Donaldson opined that his original findings warranted further investigation through a neuropsychological evaluation—which he was not qualified to conduct—to determine if Sanchez suffered from organic or developmental deficits. He stated that he would likely

have recommended that Toton retain a neuropsychologist if he had been asked, but he could not recall if such a conversation ever took place. Also, he stated that if he had been aware of information regarding Sanchez's *in utero* exposure to drugs, his childhood, and a head injury sustained when Sanchez was 18 years old, such information would have supported a recommendation for further testing. Dr. Donaldson did not repudiate his original determination that Sanchez was a highly sociopathic individual.

In support of his state habeas claim, Sanchez also submitted Dr. Froming's declaration, dated seven years after Sanchez's sentencing. Dr. Froming opined that Sanchez may have needed neuropsychological testing based on possible *in utero* exposure to drugs, his childhood marred by malnutrition and abuse, his learning difficulties in school, his history of drug abuse, a head injury, and his mental health history.

According to Dr. Froming, Sanchez displayed severe, diffuse brain damage across multiple tests from several possible sources, including *in utero* exposure to drugs, inherited deficits, head injury, and severe poly-substance abuse. However, Dr. Froming admitted that the possibilities of *in utero* drug exposure, inherited deficits, and head injuries were not confirmed but were based on anecdotal evidence regarding Sanchez's social history. These problems would have been exacerbated by drug and alcohol intoxication. Dr. Froming further opined that the likely circumstances of the Bocanegra murders indicated that Sanchez was acting with a reduced capacity to respond

appropriately to Joey's sudden attacks and would have likely prevented Sanchez from forming premeditation.[14]

Although Dr. Froming added that all the tests she performed were available and in use at the time of Sanchez's arrest and trial, she did not declare that she would have been available or willing to testify at that time. Dr. Froming opined that Sanchez's need for neuropsychological testing should have been apparent at the time of trial based on Dr. Donaldson's observations of perceptual motor disturbance and deficits in auditory and visual memory, although she did not opine whether that need would have been obvious to someone who was not a trained neuropsychologist.

Finally, Sanchez also submitted Dr. Foster's declaration in support of this claim on habeas review. Dr. Foster presented a psychiatric opinion to the California Supreme Court, dated October 19, 1995.

Dr. Foster opined that Sanchez was incapable of knowingly waiving his right to a jury trial based on the combined effects of depression, PTSD, and PCP withdrawal and flashbacks. Reviewing the reports of Dr. Matychowiak and Dr. Donaldson, Dr. Foster asserted that these evaluations

---

[14] Dr. Froming also opined that Sanchez's deficits would have prevented him from being able to knowingly and intelligently waive his right to a jury trial or to proceed with his counsel. These conclusions, however, were made by reference to California jury instructions and presented opinions regarding legal conclusions, outside the scope of Dr. Froming's expertise. *See* Cal. Evid. Code § 801 (limiting expert testimony to opinions related to a subject that is sufficiently beyond common experience that the opinion would assist the trier of fact, and based on matter including special knowledge that is of a type that reasonably may be relied upon by an expert in forming an opinion).

were inadequate and missed crucial signs in Sanchez's presentation, which should have alerted them to deeper organic and affective disorders.

### ii. Ineffective Assistance of Counsel

The California Supreme Court could have reasonably concluded that Toton's and Frank's performance did not fall below an objective standard of reasonableness when they did not seek neuropsychological testing at the penalty phase. Because we hold that Toton's and Frank's performance was not deficient, we do not reach the prejudice prong of *Strickland*.

Although Dr. Froming's and Dr. Foster's declarations may provide relevant details about Sanchez's possible mental impairments, such details were not available to Toton and Frank. At the penalty phase, Toton and Frank were in possession of Dr. Donaldson's and Dr. Matychowiak's reports. Dr. Donaldson concluded that Sanchez was well-adapted to the world in which he lived, was "highly sociopathic," and showed no indications of other significant mental illness. That opinion was consistent with Dr. Matychowiak's opinion, which also diagnosed Sanchez with a personality disorder and no other significant mental impairment. Neither Dr. Matychowiak nor Dr. Donaldson apparently communicated a need for further testing to counsel at the time of the penalty phase.

Sanchez asserts that Toton should have hired additional experts. The choice of what type of expert to use, however, is one of trial strategy and deserves "a heavy measure of deference." *Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691) (trial counsel was not ineffective for using a general psychological expert rather than one specialized in the effects of PCP). Counsel

is not constitutionally ineffective because, with the benefit of hindsight, other strategies or experts may have been a better choice. *Id.*

Also, having consulted two doctors who did not provide support for the conclusion that Sanchez was mentally impaired in a way that could provide a defense, counsel was under no duty to continue to search in an unending quest to find a supportive expert, especially when if that were done, the views of the first experts would still be discoverable and usable by the prosecution to contradict. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987) ("[C]ounsel's decision not to mount an all-out investigation . . . in search of mitigating circumstances was supported by reasonable professional judgment."); *Preston v. Delo*, 100 F.3d 596, 605 (8th Cir. 1996) ("Counsel can reasonably decide not to present potentially helpful mitigating evidence—including the testimony of mental experts—if such evidence would result in the introduction of damaging evidence."). Even if Dr. Foster and Dr. Froming had been available to testify, and had testified consistent with their declarations, the prosecution could have cross-examined them by introducing Dr. Donaldson's report, which found no severe mental illness or cognitive impairment and concluded that Sanchez was a "highly sociopathic individual." Toton and Frank could have reasonably opted to avoid further exploration of that diagnostic "basket of cobras," potentially uncovering more evidence harmful to the defense. *Gerlaugh*, 129 F.3d at 1035 (noting the "obvious countervailing tactical dangers" of evidence regarding antisocial personality disorder and holding that trial counsel was not ineffective for failing to develop possibly dual-edged psychological evidence).

Dr. Donaldson states that he was not in possession of all the reports, records, and other information that was

available. But an attorney is not responsible for gathering background material that might be helpful to an expert evaluating his client in the absence of a specific request for that information. *Turner*, 281 F.3d at 876 (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995)). To impose such a duty would "defeat the whole aim of having experts participate in the investigation." *Turner*, 281 F.3d at 876–77 (quoting *Hendricks*, 70 F.3d at 1038).

Toton and Frank possessed two expert reports that came to similar conclusions, neither of which was helpful to the defense. Both opined that Sanchez suffered from a personality disorder and did not display evidence of serious brain dysfunction. There is no indication that Dr. Donaldson advised Toton or Frank that they would need to hire additional experts or run further tests.

We hold that Toton and Frank did not render deficient performance when they did not raise Sanchez's mental impairments as mitigating evidence.

### B. Claim 59:  Mitigation Evidence

Sanchez next contends that the trial court failed to consider his mitigation evidence presented during the penalty phase as required by Cal. Pen. Code § 190.4(e). Because we cannot issue a writ of habeas corpus based on perceived error of state law, *Pulley v. Harris*, 465 U.S. 37, 41 (1984), Sanchez's claim fails.

At the penalty phase, the trial court empaneled a jury, which heard evidence of aggravating and mitigating factors before returning a verdict of death. Under Cal. Pen. Code § 190.4(e), at the time Sanchez's conviction became final, imposing a death sentence triggered an automatic motion for a modification of the death sentence, on which the trial judge

ruled. On this review of the jury's verdict, the judge must "consider . . . the aggravating and mitigating circumstances . . . [and] state on the record the reasons for his findings." Cal. Pen. Code § 190.4(e).

On direct appeal to the California Supreme Court, Sanchez asserted that the trial court committed prejudicial error in denying his automatic motion for a modification of the death sentence. *Sanchez*, 12 Cal. 4th at 83. The California Supreme Court denied this claim on the merits, determining that the trial court's decision complied with California law. *Id.*

In affirming the trial court's ruling, the California Supreme Court noted that the trial judge reviewed the statutory mitigating factors under California Penal Code § 190.3(a)-(i) and found that several did not apply. *Id*. The trial court discussed that Sanchez may have been under the influence of PCP as one of those mitigating factors. *Id*. The court then reflected, "[a]re there other circumstances that mitigate against the aggravation of the [defendant], I think not." *Id*. The California Supreme Court noted:

> [B]efore denying the modification motion, the court stated that it had considered defendant's motion to reduce penalty and the People's response, both of which referred to defendant's mitigating evidence. Thus, although the court did not specifically mention defendant's mitigating evidence of his family life, the court's statement regarding section 190.3, factor (k) evidence shows it considered all pertinent penalty phase evidence, including testimony about defendant's family life and his behavior toward his siblings, but merely found it

> unpersuasive. The record is clear that. . . the
> trial court independently assessed the weight
> of the evidence under each factor, and stated
> its reasons for denying defendant's motion.

*Id*.    The California Supreme Court concluded that all
constitutional and statutory considerations were observed in
the trial court's ruling.  *Id.*

The district court ruled that this claim raised solely an
issue of state law under *Estelle v. McGuire*, 502 U.S. 62, 67–
68 (1991) (holding that a federal habeas court may not
reexamine state court determinations of state law questions).
Accordingly, the court found that the state court's rejection
of this claim on the merits did not amount to either an
unreasonable application of clearly established federal law
or an unreasonable determination of the facts.

Sanchez asserts that the California Supreme Court's
denial of this claim on the merits amounted to an
unreasonable determination of the facts under 28 U.S.C.
§ 2254(d)(2) and that the trial court violated the Eighth and
Fourteenth Amendments when it failed to consider his
mitigating evidence.

Despite Sanchez's contention to the contrary, whether
the state court adequately considered mitigation evidence
when independently reviewing the jury's death verdict is a
matter of state law.  The Supreme Court has held that the
Eighth and Fourteenth Amendments require that a
sentencing judge or jury not be precluded from considering
in mitigation any aspect of a defendant's character or record,
or any of the circumstances of the offense that the defendant
proffers as a basis for a sentence less than death. *Eddings v.
Oklahoma*, 455 U.S. 104, 110 (1982).  But Sanchez does not
challenge the fact finder's underlying sentencing decision in

this claim. He does not argue that the California statute "preclude[s] the sentencer from considering any mitigating factor[,]," nor does he argue that the judge "instructed [the] jury to disregard the mitigating evidence." *See id.* at 112–15 (trial judge's statement that "'in following the law,' he could not 'consider' . . . the mitigating evidence of Eddings' family history" violated the Constitution). Rather, he challenges the sufficiency of the judge's consideration of mitigating factors in applying a state statute reviewing the jury's decision.

Sanchez has not cited any clearly established federal law to support the claim that the Constitution requires an independent judicial review of a jury's death verdict. That right exists in state law, and the California Supreme Court affirmed the trial court's review on direct appeal. *See* Cal. Pen. Code § 190.4(e); *Sanchez*, 12 Cal. 4th at 83. Sanchez contends that judicial review of a death penalty sentence pursuant to Penal Code § 190.4(e) falls squarely within clearly established Eighth Amendment law because "the jury verdict [merely] authorizes the death penalty, [but] the judge becomes the sentencer and must determine whether, in his or her own judgment, a death sentence is warranted." But Sanchez cites no law indicating that this procedural safeguard renders the judge the ultimate sentencer, nor does he show that the judge's independent review of the jury's verdict is subject to the same clearly established Eighth Amendment law as the jury's initial verdict. As the State argues, although the Supreme Court has discussed this procedure favorably, *see Pulley*, 465 U.S. at 52–53, it has never held that this type of trial court review is constitutionally required. We have also previously determined that a court's review of the sentencing jury's verdict is a matter of California state law. *Turner*, 281 F.3d at 871 ("[B]ecause the trial court made an individualized

determination of whether death was the proper punishment, we agree with the district court that 'at most the [trial court's] error would be one of state law.'") (second alteration in original). Without clearly established law to this effect, we cannot fairly infer that a state's decision to provide a favorable procedural safeguard ought to subject the state's procedures to double scrutiny.

Federal habeas review is not available to retry state law issues. *Milton v. Wainwright*, 407 U.S. 371, 377 (1972). Because this claim rests on an issue of state law, we do not review Sanchez's argument that the state court made an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). *See Pulley*, 465 U.S. at 41.

## C. Claim 61: Proportionality

Sanchez contends that his death sentence is disproportionate to the sentences received by his co-defendants. Although Joey was originally charged with his parents' murders, all charges against him were dropped. *Sanchez*, 12 Cal. 4th at 84. Reyes pleaded guilty to all three murders and he received a sentence of 25 years to life in prison. *Id.* According to Sanchez, these disparate impositions of penalties violate the Eighth and Fourteenth Amendments and he is entitled to intra-case proportionality review.

The California Supreme Court denied this claim on direct appeal. *Sanchez*, 12 Cal. 4th at 84. The court determined that the Eighth Amendment did not require an intra-case comparison of a defendant's sentence with other culpable persons, whether charged or uncharged. *Id.* (citing *Pulley*, 465 U.S. at 53). When Sanchez re-raised the proportionality claim with new allegations of mental

impairments on state habeas review, the California Supreme Court summarily denied the claim.

The district court held that the California Supreme Court could have reasonably concluded that Sanchez's proportionality claim was foreclosed by *Pulley*. According to the district court, the state court therefore could have reasonably determined on habeas review that Sanchez did not establish that its prior rejection of this claim on the merits amounted to either an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

In arguing that his sentence was disproportionate, Sanchez contends that the evidence that he intended to kill the Bocanegras was "far from overwhelming." According to Sanchez, he played no role in Juan's murder and he raised a reasonable doubt that he deliberately aided and abetted in Juanita's murder. Because deferential habeas review requires that clearly established federal law compel a result, Sanchez's argument fails.

In *Pulley*, the Supreme Court rejected the argument that the Eighth Amendment requires a state appellate court to compare the sentence in one case with the penalties imposed in similar cases. 465 U.S. at 43–44. The Supreme Court later held that, absent a showing that a capital punishment system operates in an arbitrary and capricious manner, habeas petitioners cannot prove a constitutional violation by showing that other defendants who may be similarly situated did not receive the death penalty. *McCleskey v. Kemp*, 481 U.S. 279, 306–07 (1987).

Sanchez contends that his case is distinct because his sentence is disproportionate in comparison to the outcomes realized by his co-defendants, rather than similarly situated

defendants in other cases.  Sanchez asserts that although the Supreme Court rejected inter-case proportionality review in *Pulley*, it does not rule out a requirement of intra-case proportionality.  But *Pulley* and *McCleskey* do not make the distinctions that Sanchez now asserts.  Nothing in *McCleskey* compels the conclusion that the category of "other defendants who may be similarly situated" does not include co-participants in the same crimes.  *McCleskey*, 481 U.S. at 306–07.

Defendants charged with the same crimes in the same case often appear before the court under different circumstances, which include their individual levels of participation in the criminal conduct, their criminal histories, individual aggravating and mitigating factors, and the extent to which they have taken responsibility for the crime.  *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 198–99 (1976) (holding that a decision to afford an individual defendant mercy does not violate the Constitution so long as "the decision to impose it [is] guided by standards so that the sentencing authority [will] focus on the particularized circumstances of the crime and the defendant.").  We acknowledge that Sanchez's sentence is severe given the results obtained by Joey and Reyes.  But we cannot grant relief based on broad principles of fairness applicable to all capital cases.  There is no clearly established federal law requiring intra-case proportionality review.

Sanchez argues that the Supreme Court in *Pulley* still assumed that some form of meaningful appellate review is required.  *See Pulley*, 465 U.S. at 45.  However, the California Supreme Court provided meaningful appellate review when it rejected Sanchez's proportionality claim.  It concluded that multiple circumstances pertained to Sanchez individually, including his criminal history and his status as

a recent parolee following imprisonment for two assaults, and any comparisons to the outcomes obtained by his co-participants do not accrue in his favor. *Sanchez*, 12 Cal. 4th at 85. We affirm the district court's denial of habeas relief on Sanchez's proportionality claim.

## IV. CONCLUSION

Under the highly deferential standards imposed on us by AEDPA, we cannot conclude that the California Supreme Court's inferred conclusions were "an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). For the foregoing reasons, on the issues discussed in this opinion, we affirm the district court's denial of Sanchez's petition.

**AFFIRMED.**